# GILMORE *v.* STATE OF MARYLAND

[No. 26, September Term, 1971.]

*Decided November 9, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Jerome A. Dashner* for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Arrie W. Davis, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

We shall here affirm convictions of murder in the first degree and robbery. The death sentence was imposed on the murder charge which brought the appeal to this Court. The sentence for robbery was 10 years to be served consecutively to the murder sentence. The trial judge said:

> "This may seem to be an incongruity and a contradiction in and of itself, but the Court is directing that the sentence on the robbery indictment be served consecutively in the event that the death penalty imposed under Indictment No. 2789 should hereafter be commuted to life imprisonment."

No undue dispatch can be seen in the case, but the dispatch with which it has moved stands as a mark that the Maryland court system moves faster than some other court systems in the country. The crime in question took place on May 20, 1970. Appellant Ike Gilmore (Gilmore)

was indicted on June 4, 1970, and arraigned on June 12. Trial began before Judge O'Donnell without a jury on October 30 and continued through November 10 when a guilty verdict was rendered. Motion for new trial was filed on November 12 and denied on December 8. Sentence was imposed on March 4, 1971, after the filing of medical and probation reports. An appeal was entered to this Court on March 8, 1971. The record reached here on March 24 for our September Term, 1971.[1] The cause was argued on October 12.

Gilmore presents 10 questions to us. They are:

"1. Was the warrantless arrest of the appellant executed without 'probable cause' in violation of the fourth Amendment to the Constitution of the United States?

"2. Was the appellant's conviction based in part upon the use by appellee of illegally seized evidence?

"3. Did the trial court erroneously overrule appellant's objections to the admissibility of an incriminating statement?

"4. Did the trial court improperly consider prejudicial testimony and evidence illegally seized by the police in a warrantless search of a bus station locker?

"5. Did the trial court err in denying appellant's motion for judgment of acquittal?

"6. Did the trial court abuse its discretion in allowing the appellee to reopen its case-in-chief, for the purpose of permitting the introduction of incriminating evidence by the appellee?

"7. Did the trial court abuse its discretion by assisting the appellee in the tactical presentation of evidence thereby denying appellant due process of law?

---

1. Under Maryland Rule 804 if the case had reached us before March 1, 1971, it would have been placed on the docket for our September Term, 1970, in which case we would have heard arguments and filed our opinion before we rose for the summer.

"8. Was the appellant denied due process of law as a result of appellee's disorganized, uncoordinated and disjoined [sic] manner of presentation of evidence in the case-in-chief, thereby rendering impossible a systematic appellate review of the trial record?

"9. Did the trial court convict appellant on the basis of insufficient circumstantial evidence?

"10. Is the penalty of death imposed upon appellant in violation of the eighth and fourteenth amendments to the U. S. Constitution?"

Emma Burdette testified that on May 20, 1970, she resided in an apartment at 3201 North Calvert Street in Baltimore. A magazine salesman knocked at her door at about 10:30 that morning. She did not admit him. She could not identify the salesman other than by race. Gilmore is of that race. She observed the salesman knocking on the doors of other apartments.

Mrs. Burdette went to the first floor apartment of her best friend, Mae Wood, at about 2:30 p.m. on the same day. She found that Mrs. Wood had been beaten. The apartment had been ransacked. Mrs. Burdette, a nurse, was unable to find a pulse or respiration.

The autopsy report showed Mrs. Wood to have been violently and savagely beaten. She sustained broken cheek bones, a broken jaw, and a fractured skull. The thyroid bone in her neck apparently was fractured by strangulation. Virtually every rib in her body was broken as a result of some compression-type force being applied to it. The medical examiner classified all of the injuries as blunt force injuries. The trial judge said of the injuries in his oral opinion:

"The evidence offered in this case concerning the manner and means of the decedent's death are the most extensive and vicious that this Court has ever had brought to its attention as either, in its earlier days as a prosecutor, in its

later days as a defense counsel in criminal cases, or since I have been a member of this Bench."

Mary Nolen and Richard Best, co-workers of Gilmore, and George Clotfelter, manager of the magazine company crew of which Gilmore was a member, all testified to seeing Gilmore in the bar of the hotel at which they were staying in Baltimore on the evening of May 20. His knuckles were bruised. He said that he had been in a fight. He exhibited to them five rings. Two of the rings later were positively identified as having been owned by the victim. A third ring, removed from Gilmore at the time of his arrest and described as being a wedding band, was identified by these three individuals as being one of the five rings so exhibited. He offered to sell the rings. Mary Nolen bought one. Another of the five rings was described as having a gold crest or coat of arms on it.

Clotfelter described the conditions under which he fired Gilmore (and then subsequently rehired him) on May 20. When Clotfelter extended his hand to shake hands with Gilmore he said Gilmore "kneeled", explaining "[h]e went to his knee." Gilmore explained his actions to Clotfelter by saying that he had been in a fight in the territory in which he was selling magazines. Gilmore's right hand was described as swollen, sore, and skinned.

William Brown said a person he identified as Gilmore approached him at the corner of St. Paul and 31st Streets on May 21 and attempted to sell him magazines. Credentials exhibited at that time showed the name "Ike Gilmore". The person who approached Brown said he was from Alabama, as is Gilmore. Brown left the corner but later met Gilmore at 29th and St. Paul Streets where Gilmore said he had missed his ride. At that time he displayed a ring and gave it to Brown, stating that it had brought him good luck. This ring is described as a gold crest or coat of arms ring. It was one of the rings identi-

fied by Nolen, Best, and Clotfelter as having been in the possession of Gilmore the previous evening. While Gilmore and Brown were talking a white van passed by. Gilmore stated that it was his "bus" with part of his crew. Brown's description of the van corresponded with the description of the vehicle used by the magazine group as described by them. Brown called the police and turned the ring over to them.

Detective Wagner of the homicide squad interviewed Brown and received the gold crest ring from him. The victim's relatives identified it to him as the property of the victim. He ascertained that a magazine group had checked out of a Baltimore hotel on May 24 and had gone to York, Pennsylvania. Miss Nolen turned over to Detective Wagner a ring which she said she bought from Gilmore. The victim's relatives then identified that ring to Wagner as the property of the victim. This identification was made on the evening of May 27. Later that same evening Gilmore was apprehended by three Baltimore police officers in company with Best, one of his former fellow employees. The arrest took place on Howard Street in Baltimore near the Greyhound terminal.

The arrest was without a warrant. Wagner was not present when the arrest was made. Sgt. Dungan, one of the arresting officers, did testify that he went to York, Pennsylvania, in connection with the investigation and that he was present when the ring was recovered from Miss Nolen. He was not present when it was identified. He was present when Miss Nolen said she obtained the ring from Gilmore.

Gilmore was interrogated subsequent to his apprehension. As he put it in the statement of facts in his brief:

"[Sgt.] Dungan testified from the notes that he took while Gilmore was being questioned which basically revealed that Gilmore admitted being in the home. He was shown photographs and he admitted having talked with persons in the apartment house and that one woman had

opened the door just a little and that he was of-
fered one dollar by one woman but he refused to
take it. He admitted he sat on the couch shown
on the photographs and that Mrs. Wood was
wearing a green dress. He explained the rings
by stating that he met a girl on the street and
she gave him the rings and transistor radio and
later they were stolen from his room at the
Roundtowner Hotel. He purchased the ring with
the coat of arms from a hippie."

Detective Powell testified that the police recovered "a
small, plain gold wedding band from Mr. Gilmore's left
small finger" and "[a] pair of brown, possibly tan, boot-
type shoes, with straps and buckles", which he was wear-
ing. The boots were blood stained. Powell at that time
observed "an unusual amount of swelling to [Gilmore's]
right hand, and, also, what appeared to be a small cut
or laceration near the knuckle above the smallest finger
of his right hand."

## PROBABLE CAUSE FOR ARREST

The law on this subject was summed up by Judge Hor-
ney for the Court in *Mulcahy v. State,* 221 Md. 413, 158
A. 2d 80 (1960) :

"Article 26 of the Maryland Declaration of
Rights prohibits the search of suspected places
and the seizure of persons or property without
a warrant, but this provision of the constitution
does not prohibit arrest without a warrant
when it is lawful and in cases where the public
security demands it. In this state it has long
been settled that a peace officer may arrest with-
out a warrant, provided there were reasonable
grounds to believe at the time of the arrest that
a felony had been committed and that the person
arrested had committed the offense. *Baltimore
& O. R. Co. v. Cain,* 81 Md. 87, 31 Atl. 801
(1895) ; *Kirk & Son v. Garrett,* 84 Md. 383, 35

Atl. 1089 (1896) ; *Edger v. Burke,* 96 Md. 715, 54 Atl. 986 (1903) ; *Brish v. Carter,* 98 Md. 445, 57 Atl. 210 (1904) ; *Freedman v. State,* 195 Md. 275, 73 A. 2d 476 (1950) ; *Edwards v. State,* 196 Md. 233, 76 A. 2d 132 (1950) ; Kauffman, *Law of Arrest in Maryland,* 5 Md. L. Rev. 125, 159 (1941). In *Kirk & Son* and *Brish,* both *supra,* it was said, to use the language of the *Brish* case at p. 450, that it is 'wholly immaterial whether the suspicion arises out of information imparted to the officer by some one else, or whether it is founded on his own knowledge.' Furthermore, in the *Kirk & Son* case this Court said [p. 406] : '[i]t may be broadly stated that what amounts to probable cause * * * [will be] such reasonable grounds for suspicion of felony as will justify and require an officer to make an arrest.' And in the *Edwards* case, *supra,* at p. 237, citing *Brinegar v. United States,* 338 U. S. 160 (1949), we stated in effect that the substance of all definitions of 'probable cause' is a reasonable ground for believing that the person about to be arrested is guilty and that 'probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.' " *Id.* at 421-22.

See also *Edwardsen v. State,* 231 Md. 332, 336, 190 A. 2d 84 (1963), and *Farrow v. State,* 233 Md. 526, 197 A. 2d 434 (1964).

The Supreme Court of the United States in *Draper v. U. S.,* 358 U. S. 307, 311-312, 79 S. Ct. 329, 3 L. Ed. 2d 327 (1959), has specifically held that although hearsay evidence is not legally competent evidence in a criminal trial, it may be admitted in determining whether there

is probable cause, citing *Brinegar v. U. S.,* 338 U. S. 160, 172-173, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949). In a footnote it referred to the opinion of Judge Learned Hand in *U. S. v. Heitner,* 149 F. 2d 105 (2d Cir. 1945), where he said for the court:

> "It is well settled that an arrest may be made upon hearsay evidence; and indeed, the 'reasonable cause' necessary to support an arrest cannot demand the same strictness of proof as the accused's guilt upon a trial, unless the powers of peace officers are to be so cut down that they cannot possibly perform their duties." *Id.* at 106.

*Draper* is mentioned in *Spinelli v. U. S.,* 393 U. S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969). Nothing in that opinion nor in *U. S. v. Harris,* 403 U. S. 573, 91 S. Ct. 2075, 29 L. Ed. 2d 723 (1971), alters its hearsay holding.

Much is made in this case of the fact that Sgt. Dungan, the only arresting officer who testified for the State relative to the arrest, was not informed by Detective Wagner of information which would have shown probable cause to believe Gilmore committed the crime with which he was charged when he was arrested. The record to which reference is made reads:

> "(The Court) Had you gotten any information from Detective Wagner?
> "(Mr. Dashner) Objection.
> "(The Court) Overruled,—before you made the arrest in this case?
> "(The Witness) I don't understand you, sir.
> "(The Court) I can't make it any plainer—did you get any information from Detective Wagner before you made the arrest in this case?
> "(The Witness) I don't recall."

Sgt. Dungan was further interrogated as to his basis for arrest of Gilmore, the record being:

"Q. (By Mr. Davis) Had you received some information from Detective Wagner in regards to this case?

"(Mr. Dashner) Objection.

"(The Court) Sustained. He answered the Court's question, 'No.'

"Q. (By Mr. Davis) On what did you base your arrest of the defendant, Mr. Gilmore?

"(Mr. Dashner) Objection.

"(The Court) I will overrule it only on the issue of legality of arrest.

"(The Witness) After a ring had been identified that belonged to the victim, which was turned over to Miss Mary Nolen in Pennsylvania, and by whom, we went out.

"(The Court) And what? I don't understand —what is the answer?

"(The Witness) A ring recovered from Pennsylvania from Mary Nolen was then identified by relatives of the victim that it belonged to the victim.

"(Mr. Dashner) Objection.

"(The Court) Well, I will sustain the objection to that, unless the officer was there.

"Q. (By Mr. Davis) Officer, were you present when this ring was identified? A. No, sir.

\* \* \*

"Q. (By Mr. Davis) Sergeant Dungan, did you have any other information about the person whom you were seeking, about the fact that he had this ring Miss Nolen had?

"(Mr. Dashner) Objection.

"(The Court) Sustained. I didn't hear that he had this ring that Miss Nolen had, if he did.

"Q. (By Mr. Davis) Sergeant, the ring to which you have referred—strike that.

"Sergeant Dungan, were you present when the ring was recovered from Miss Nolen?

\* \* \*

"(The Witness) Yes.

"Q. (By Mr. Davis) Did you receive certain information from Miss Nolen?

* * *

"(The Witness) Yes.

* * *

"Q. (By Mr. Davis) Where did Miss Nolen say she had gotten the ring? A. From Ike Gilmore.

"Q. Had that ring been identified—

"(Mr. Dashner) Objection.

"(The Court) I will sustain the objection to it. The officer said he would only be able to answer that by hearsay."

In *Smith v. United States*, 358 F. 2d 833 (D.C. Cir. 1966), there was a contention that "the Constitution requires the *arresting* officer personally, independent of his police colleagues, to have knowledge of all facts necessary to constitute probable cause including reliability of any informants" (emphasis in original). Judge (now Chief Justice) Burger there said for the court:

"The short answer to this claim is that this Court has already decided that probable cause is to be evaluated by the courts on the basis of the collective information of the police rather than that of only the officer who performs the act of arresting. [Citing authorities.] Appellant fails in his efforts to distinguish these cases. Moreover, Appellant's reasoning suffers from a more basic fallacy than adverse precedent. Certainly two or three government agents together could go before a Commissioner to procure a warrant on the sum of their information and, once that warrant is issued, none of them need participate in the actual arrest.

"The knowledge or information of the arresting officer at the time of arrest is relevant only

where an arrest is predicated on that officer's personal observations and information concerning the criminal act. The correct test is whether a warrant if sought *could have* been obtained by law enforcement agency application which disclosed its corporate information, not whether any one particular officer could have obtained it on what information he individually possessed." *Id.* at 835 (Emphasis in original.)

The same court, also speaking through Judge Burger, had previously said in *Williams v. U. S.,* 308 F. 2d 326 (D.C. Cir. 1962), cited in *Smith*:

"We have set forth appellant's contentions in detail because they are relatively novel claims. We avail ourselves of the occasion to make it clear that in a large metropolitan police establishment the collective knowledge of the organization as a whole can be imputed to an individual officer when he is requested or authorized by superiors or associates to make an arrest. The whole complex of swift modern communication in a large police department would be a futility if the authority of an individual officer was to be circumscribed by the scope of his first hand knowledge of facts concerning a crime or alleged crime.

"When the police department possesses information which would support an arrest without a warrant in the circumstances, the arresting officer, if acting under orders based on that information, need not personally or first hand know all the facts. The test, as we have said, is whether a prudent and cautious officer in those circumstances would have reasonable grounds —not proof or actual knowledge—to believe that a crime had been committed and that appellant was the offender." [Citing authorities.] *Id.* at 327.

There was evidence before the court that the police department knew that a homicide had been committed, that Gilmore was a magazine salesmen seen in the general vicinity in which the victim lived, and that two rings had been recovered, each of which was identified by the victim's relatives as her property and each of which had come from Gilmore. This certainly would constitute probable cause for the police department to charge Gilmore with this homicide. It is to be regretted that the State did not see fit to bring out that the police department in advance of arrest was in possession of all the information to which Nolen, Best, and Clotfelter testified, which would have made an even stronger case for probable cause.

In *Farrow v. State*, 233 Md. 526, 197 A. 2d 434 (1964), this Court said:

> "When Sergeant Rawlings, after interviewing defendant's wife, thereafter broadcast the description of the defendant and his automobile and advised that he was wanted by the Baltimore City police for rape and other crimes, we think it is clear that he had probable cause to do so. The officers in Anne Arundel County who made the arrest knew nothing about the probable cause but they had received a 'look out' for the defendant from a responsible source and we think that is sufficient. If the police team working on the particular case had accumulated sufficient information to furnish probable cause for a reasonable man to believe that the alleged crime had been committed and that there was probable cause to believe that the defendant was involved therein, there was sufficient cause for his arrest." *Id.* at 531-32.

It would have been preferable for the State to have spelled out its case for probable cause with greater precision. Certainly it should have brought out that Sgt. Dungan and his associates were directed to apprehend

Gilmore on a murder charge. Indeed, as one reviews the record one is inclined to wonder whether the State indulged in the elementary trial preparation of outlining what one intends to prove by what witnesses and reviewing with those witnesses their contemplated testimony in advance of trial.[2] However, when, with the information the Baltimore City Police Department had, Gilmore was arrested by Sgt. Dungan in company with Sgt. Bannon, Detective Cousins and Richard Best, Gilmore's co-worker, the conclusion becomes inescapable that they had been directed to arrest Gilmore, which direction would bring the case within the holding in *Farrow*. It is obvious that it was not for purposes of pure sociability that the three officers and the co-worker were walking in the vicinity of the Greyhound bus station at Howard and Center Streets. Confirmation for this conclusion is found in the testimony of Detective Cousins when he was called as a witness by Gilmore. The record at that point is:

"Q. Do you know where you apprehended the defendant?

"A. Somewhere on Howard Street, near Saratoga, or Saratoga near Howard—in that vicinity. Just what spot it was, I can't remember.

"Q. Was he walking along the street?

"A. He was walking along the street.

"Q. Tell us what happened when you saw him walking along the street.

"A. I was in company with Sergeant Dungan and Sergeant Bannon and the civilian, and, as per instructed [sic], they were looking for

---

2. See the excellent article entitled "Instructions for Witnesses" by Payne H. Ratner, Jr., of the Kansas Bar in 2, 4 The Practical Lawyer 44 (1956), in which the comment is made, "[N]o good trial lawyer will discount the importance of an extended pre-trial conference with every witness." Some trial counsel have used reprints of this article to prepare witnesses for trial. It can be of substantial assistance in both civil and criminal cases. In fact, some trial counsel have believed it of assistance even in criminal cases before trial magistrates, including use with the accused.

someone in reference to a murder investigation. And, at this particular time, the civilian pointed out the defendant, here, and said, 'This is the man.' and, then, on orders from Sergeant Bannon, he said, 'We have to get him — get him.' We got out of the car. I was the first one who approached him with my badge in my hand, stating, 'Police officer, we want you in reference to a homicide.' As I put my handcuffs on him he was getting wild and so forth, and, then, Sergeant Bannon said to him—no, he said, 'What am I being locked up for—what am I being locked up for?' And I says, 'For homicide investigation.' "

The evidence as to the overall knowledge of the Baltimore Police Department was before the court prior to the testimony as to Gilmore's arrest. We hold the arrest to have been a lawful one upon the basis of probable cause and we further hold that it was not necessary to spell out to the arresting officer the information which his co-workers possessed which led them to believe Gilmore might be the perpetrator of the crime.

## ILLEGALLY SEIZED EVIDENCE

When Gilmore was taken to police headquarters and before any statement was received from him, a ring and bloodstained boots were seized. The trial judge said of the ring:

"It was also admitted into evidence as State's Exhibit 6 a plain gold wedding band, which was removed off the outside little finger on the left hand of the defendant at the time he was arrested. An examination of that ring by the Court, sitting as a jury, persuades the Court that it is a ring of female size, and not of male size; that it would not be a male wedding band, because of its circumference. And, indeed, this is borne out by the fact that the defendant wore

it on his little finger of his left hand that it was
a female's ring."

No attempt was made at the trial to elicit from the family of the victim identification of this ring as having belonged to the victim.

It was determined that the blood was human blood, but the specimens were too small to classify as to blood type. Accordingly, no effort was made to show whether the blood type corresponded with that of the victim.

Since the arrest was legal, it follows that the two items were legally seized and properly admitted into evidence. *Sterling v. State*, 248 Md. 240, 245, 235 A. 2d 711 (1967).

## OBJECTIONS TO ADMISSIBILITY OF INCRIMINATING STATEMENT

Gilmore contends that although it appears that a "waiver" form was read to him and that he himself read the form, that nowhere does it appear that he articulated a waiver of his rights as required by *Miranda v. Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). He further contends that reading such forms to an accused who is about to be interrogated, who states that he understands the words being read to him, is "insufficient to meet the burden of meeting procedural waiver requirements before use can be made at trial of an incriminating statement taken by the police."

In this case two police officers testified relative to the waiver. Detective Wagner said that when Gilmore was interrogated he was told that the officers were investigating the homicide of Mrs. Mae Hundley Wood which occurred in the 3200 block of Calvert Street. It was determined that Gilmore could read and write. Wagner said Gilmore was handed a copy of the form. It then was read aloud while Gilmore followed along. The form was signed by Gilmore, Detective Wagner, and Detective Powell. The form was read into the record as follows:

" 'I have been advised by Detective Joseph R. Powell of my rights, and I understand, number

one, that I have an absolute right to remain silent; number two, that anything I say or write may be used against me in a court of law; number three, that I have the right to consult a lawyer before any questioning, and to the presence of a lawyer before answering any questions, or at any time while being questioned; number four, that if I want a lawyer and cannot afford to hire one, I shall not be asked any questions, and the courts will be requested to appoint a lawyer for me; number five, that if I agree to make a statement, I may stop at any time and request the presence of a lawyer, and that no further questions will be asked of me; number six, that I have read this explanation of my rights, and I understand the explanation. I hereby declare, with full knowledge and understanding of my rights, that I do not want a lawyer at this time. I am willing to answer questions, and I wish to make a statement; number seven, that no promises or inducements have been offered to me by anyone. I have not been threatened or intimidated by anyone, and I have not been forced to make a statement. The decision to make a statement has been entirely free and voluntary on my part.' "

The initials "IG" appeared beside the seven statements. It was testified that these were the initials of Gilmore placed there by him.

In *Bell v. U. S.*, 382 F. 2d 985 (9th Cir. 1967), the court said:

"It is urged that Agent Howerton's testimony pertaining to appellant's declaration should have been excluded for two reasons. The first is that Agent Howerton was obliged to advise appellant of his *Miranda* rights orally and not in writing. This is absurd. If appellant read and

> understood the written advice, then he acquired knowledge of his rights in a very satisfactory and most unimpeachable way. There is no requirement as to the precise manner in which police communicate the required warnings to one suspected of crime. The requirement is that the police fully advise such a person of his rights, and appellant made no showing that he did not read or understand the written warnings which were presented to him." *Id.* at 987.

The statement used in this case except for points six and seven, contained basically the same language as the form to which reference was made in *Fritts v. U. S.*, 395 F. 2d 219 (5th Cir. 1968), points six and seven not being on the FBI card there used.

As a matter of fact, Gilmore signed such a form not once, but twice. An assistant state's attorney was brought into the interrogation room some time after the questioning began. He apparently desired to be certain that Gilmore was informed of his rights. Gilmore then signed the second form.

As was said in *Craft v. U. S.*, 403 F. 2d 360, 364 (9th Cir. 1968), "The pivotal question is whether the appellant voluntarily, intelligently and understandingly waived his right to counsel when being interrogated." We conclude, as did the trier of fact, that the evidence demonstrates that Gilmore freely, voluntarily, intelligently, and understandingly waived his rights.

Gilmore further objects because although the interrogation consumed some 4 hours and 25 minutes, the verbal statement when reduced to writing took up only a page and a quarter. He claims also that a courtroom demonstration of the actual time needed to reduce the statement to writing was only a period of approximately 20 minutes.

The statement introduced does not purport to be a transcript of everything that was said during the entire

interrogation. It is just what it purports to be, the statement of the accused.

Gilmore also points to the fact that he testified that during the interrogation he denied killing anyone, yet this part of his statement was not related to the court by the State, nor was this testimony of his rebutted. We see no grounds for reversal in this. His statement came before the court out of his own lips. The court heard him and saw him. It was not required to believe him.

## ALLEGED IMPROPER CONSIDERATION OF ILLEGALLY SEIZED EVIDENCE

Gilmore says:

"The Appellee repeatedly offered prejudicial evidence of a search of a bus station locker notwithstanding the patent illegality of the warrantless search conducted by the police. It is impossible to determine from the state of the record below which items actually seized by the police from the locker were used during trial of this case or during interrogation of the Appellant, in view of the clouded and confused chain of custody of jewelry allegedly belonging to the deceased, identified by members of [her] family, and allowed in evidence."

There were items seized from a locker at a bus station which the trial court refused to admit into evidence. The record clearly disclosed what was admitted into evidence. The only such items said to have been owned by the victim were the two rings to which reference has heretofore been made, one of which was obtained from Miss Nolen, a co-worker, and the other from William Brown. The only other item that could possibly have been connected with the victim was the gold wedding ring removed from Gilmore at the time of his arrest. The only other tangible item of property admitted into evidence was the blood spattered shoes removed from Gilmore.

Gilmore says:

"Although the trial court finally ruled the search to have been illegally conducted and granted Appellant's motions to strike, substantial and irreparable damage to Appellant's fair trial entitlement was done by prejudicial, frequent efforts by the Appellee to introduce the results of the search."

The short answer to his contentions is found in *State v. Hutchinson*, 260 Md. 227, 271 A. 2d 641 (1970), where Judge Finan said for the Court:

"[I]t is clear that we have consistently reposed our confidence in a trial judge's ability to rule on questions of admissibility of evidence and to then assume the role of trier of fact without having carried over to his factual deliberations a prejudice on the matters contained in the evidence which he may have excluded." *Id.* at 236.

To hold otherwise would render almost impossible trial by the court as distinguished from trial by jury. As pointed out by Chief Judge Bond in his article entitled "The Maryland Practice of Trying Criminal Cases by Judges Alone, Without Juries" in 11 A.B.A.J. 699 (1925) and in *Rose v. State*, 177 Md. 577, 10 A. 2d 617 (1940), the Maryland practice of trials without juries has "regularly been allowed since near the founding of the province, if not from the beginning," cited in *Grammer v. State*, 203 Md. 200, 213-14, 100 A. 2d 257 (1953), and more recently in *State v. Zimmerman*, 261 Md. 11, 273 A. 2d 156 (1971).

## GILMORE'S MOTION FOR JUDGMENT OF ACQUITTAL

Gilmore says:

Appellant made motion for judgment of acquittal at the conclusion of the prosecution

and the trial court denied the motion. In its ruling on the motion, the Court relied heavily on the presumption that the Appellant, in recent possession of items belonging to the deceased, was the robber. The Court further placed great weight on Appellant's admissions of his presence in the deceased's apartment during a critical period, when shown photographs following his arrest by the police. Appellant strongly urges that the court should not have considered any testimony of items seized by the police, or statements made to the police, after Appellant's unlawful arrest. The confused state of the record below does not permit, on appellate review, a clear understanding of what identification of recently possessed stolen goods the trial court relied upon, and whether these seized items were the product of illegal searches made in this case."

By offering evidence, Gilmore withdrew his motion for judgment of acquittal. Maryland Rule 755 b. Accordingly, the propriety of the trial court's ruling is not before us. We comment only because of the seriousness of the sentence imposed.

We find no confused state of the record. We have heretofore held the arrest to have been lawful. It is clear that the two items of recently possessed stolen goods upon which the trial court relied were the two rings we have heretofore discussed and that these rings had been identified by several individuals as being in the possession of Gilmore and fully identified by the victim's family as belonging to the victim. The ruling was proper.

## REOPENING OF THE STATE'S CASE

The State rested its case at the end of the fourth trial day. The trial judge asked the State whether there were other items of property that had been referred to in the evidence that had been marked only for identification

which were to be introduced into evidence. The State replied in the negative. Immediately thereafter Gilmore's attorney made a motion "for directed verdict of acquittal as to each and every count." The trial judge noted this on the record and said it would be considered the following morning. When court convened the following morning the State over the objection of the defense asked that its case be reopened for the purpose of introducing the wedding band. Permission was granted and the wedding band was received in evidence.

The question of whether the case should have been reopened was within the sound discretion of the trial judge. *Lumbermens Mut. Cas. Co. v. Ely,* 253 Md. 254, 263, 252 A. 2d 786 (1969); *Telak v. Maszczenski,* 248 Md. 476, 495, 237 A. 2d 434 (1968); *Willey v. Glass,* 242 Md. 156, 163, 218 A. 2d 212 (1966), and from its action granting or rejecting the application no appeal will lie. *Guyer v. Snyder,* 133 Md. 19, 22, 104 A. 116 (1918). There was no abuse of discretion here.

## ASSISTANCE OF THE TRIAL JUDGE IN PRESENTATION OF EVIDENCE

Gilmore complains of two instances.

When the State had completed its examination of Detective Powell the trial judge suggested to the prosecuting attorney, "If you have any other questions that you want to examine him about, now is the time to do it." No further questions were asked, but the judge then proceeded to question Powell relative to a ring received for identification and directed the assistant state's attorney to exhibit the ring to the witness for possible identification, despite objections by Gilmore.

Immediately prior to the closing of its case by the State the court pointed out that there were some items of property that had been referred to in evidence that had only been marked for identification. The judge then asked whether any steps were being taken to establish their introduction and was advised there were not. It was immediately after this that the State rested and Gilmore

moved "for a directed verdict of acquittal". The following morning, as has been previously noted, the case was reopened and the wedding band admitted into evidence.

Gilmore says:

"Conceding that the trial court is permitted to clarify facts by questioning witnesses, Appellant urges that in both instances the trial court exceeded its discretionary authority by actually developing the manner of presentation of evidence for the Appellee."

In *Bartholomey v. State*, 260 Md. 504, 273 A. 2d 164 (1971), basically the same point was considered by this Court. Defense counsel in that case had objected in one instance to the trial court's "educating the prosecution." We there rejected the contentions of the defendant upon the strength of *Madison v. State*, 200 Md. 1, 12, 87 A. 2d 593 (1952); *Jefferies v. State*, 5 Md. App. 630, 632, 633, 248 A. 2d 807 (1969); and *Plank v. Summers*, 203 Md. 552, 554, 555, 102 A. 2d 262 (1954). *Bartholomey* is authority for rejection of the contention here.

## DISJOINTED RECORD

Gilmore contends "that the state of the record of trial proceedings defies careful scrutiny for purposes of developing his case for appellate review, thereby effectively denying to [him] complete appellate review." We have carefully perused the record. We do not share his reservations relative to it. We have had no difficulty in our review of the record. Accordingly, we find this contention to be without merit.

## SUFFICIENCY OF THE EVIDENCE

Gilmore claims that he was convicted on the basis of insufficient circumstantial evidence. He contends that the State "must prove by direct evidence that [Gilmore] was in or near the apartment of the decedent at the time of her death, and failing to prove this, the trial court was without sufficient evidence, circumstantial or direct,

to connect [him] with any assault upon the decedent. * * * Appellant's reasonable explanation of his possession of the identified items should have been accorded the greater weight when balanced against the record of proceedings in this case, and an acquittal of murder and robbery should have been found by the trial court."

We find relevant much of what was said by Judge Orth for the Court of Special Appeals in *Nichols v. State*, 5 Md. App. 340, 247 A. 2d 722 (1968), where he said:

"The law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existence of a fact may be inferred. No greater degree of certainty is required when the evidence is circumstantial than when it is direct, for in either case the trier of fact must be convinced beyond a reasonable doubt of the guilt of the accused. * * *

"* * * In considering the evidence the lower court was guided by established rules of law. Proof of guilt beyond all doubt has never been required. *Young v. State*, 4 Md. App. 286. To prove guilt beyond a reasonable doubt it is not necessary that every conceivable miraculous coincidence consistent with innocence be negatived. *Hayette v. State*, 199 Md. 140, 144. The lower court could weigh the evidence and determine the credibility of the witnesses. *Roeder v. State*, 4 Md. App. 705; *Gibson v. State*, 4 Md. App. 222. It was under no obligation to believe the appellant's denials or explanations. *Eley v. State*, 4 Md. App. 230; *Tillery v. State*, 3 Md. App. 142. It could weigh the alibi testimony and was not required to accept its truthfulness. *Logan v. State*, 1 Md. App. 213. And if we assume that the evidence against the appellant was solely circumstantial, such assumption would not change the result. The lower court could have properly found that the circum-

stances, taken together, were inconsistent with, or such as to exclude every *reasonable* hypothesis or theory of innocence. '[C]ircumstantial evidence need not be such that no possible theory other than guilt can stand * * *. It is not necessary that the circumstantial evidence exclude every possibility of the defendant's innocence, or produce an absolute certainty in the minds of the jurors. The rule does not require the jury to be satisfied beyond a reasonable doubt of each link in the chain of circumstances relied upon to establish the defendant's guilt.' 3 *Wharton's Criminal Evidence* (12th Ed. 1955) § 980, p. 477. While it must afford the basis for an inference of guilt beyond a reasonable doubt, it is not necessary that each circumstance, standing alone, be sufficient to establish guilt, but the circumstances are to be considered collectively. 1 *Underhill's Criminal Evidence* (5th Ed. 1956) § 17, p. 23 and p. 25." *Id.* at 350-51. (Emphasis in original.)

As Judge (later Chief Judge) Henderson said for the Court in *Breeding v. State,* 220 Md. 193, 198, 151 A. 2d 743 (1959), "We think the [trier] of fact could properly draw the inference, from all the circumstances of the case, that she met her death at his hands, and that the killing was premeditated and with malice aforethought."

## CONSTITUTIONALITY OF THE DEATH PENALTY

The contentions of Gilmore in this regard were fully reviewed and rejected by Judge Barnes for the Court in *Bartholomey v. State, supra.*

If and when the Supreme Court of the United States holds that the imposition of the death penalty in a case such as this is a violation of the Constitution of the United States, we shall be bound accordingly. Until such time, we hold the death penalty in a case such as this is constitutionally permissible.

*Judgments affirmed.*