607 A.2d 42

**Gerald Wynn EILAND**

v.

**STATE of Maryland.**

**Jerry Samuel TYLER**

v.

**STATE of Maryland.**

**Nos. 903, 951, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

May 26, 1992.

Certiorari Granted Oct. 8, 1992.

Steven F. Reich (Charles F.C. Ruff, Covington & Burling, Washington, D.C., Leonard R. Stamm and Goldstein & Stamm, P.A., Greenbelt, on the brief), for appellant, Eiland.

Richard A. Finci (Victor A. Houlon and Pickett, Houlon and Berman, on the brief), Hyattsville, for appellant, Tyler.

Warren Anthony Fitch and Swidler & Berlin, Chartered of Washington, D.C., for amicus curiae, Nat. Ass'n of Crim. Defense Lawyers, Inc., as to appellant, Eiland.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty., for Prince George's County of Upper Marlboro, on the brief), for appellee.

Argued before MOYLAN, ROSALYN B. BELL and WENNER, JJ.

MOYLAN, Judge.

On the afternoon of December 4, 1990, in what turned out to be a highly publicized murder case, James "Jay" S. Bias, III, the younger brother of former University of Maryland basketball star Len Bias, was senselessly gunned down in cold blood as he was leaving the parking lot of the Prince George's Plaza Mall. In a joint trial before a Prince George's County jury, presided over by Judge G.R. Hovey Johnson, the appellants, Gerald Wynn Eiland and Jerry Samuel Tyler, were convicted of that murder.

Tyler was convicted of murder in the first degree and the use of a handgun in the commission of a felony. He was sentenced to life imprisonment for the murder and to a consecutive term of 20 years for the handgun violation. Eiland was convicted of murder in the second degree, of the use of a handgun in the commission of a felony, and also of being an accessory after the fact to murder. He was sentenced to a term of 30 years for second-degree murder, ten of which were suspended, and to a consecutive term of 20 years for the handgun violation, ten of which were also suspended, for a total of 30 years to be served. Recogniz-

ing the then-present inconsistency between convictions for murder and accessory after the fact to murder, Judge Johnson vacated the conviction on the accessory charge and entered a judgment of acquittal as to it.

Each appellant has filed, briefed, and argued a separate appeal. Because they were both convicted at a joint trial, because the evidence admitted as to each was also admitted as to the other, and because of the broad (albeit not total) overlap of the issues raised by the two appellants, we have elected to consolidate the two appeals for purposes of this opinion. Both appellants raise the following four contentions:

1. That the evidence was not legally sufficient to support the convictions;

2. That Judge Johnson erroneously refused to sever their trials;

3. That Judge Johnson erroneously admitted in evidence the last words of Jay Bias; and

4. That the State unconstitutionally used its peremptory challenges to exclude women from the jury solely on the basis of gender.

The appellant Tyler alone raises one additional contention:

5. That the State unconstitutionally used its peremptory challenges to exclude blacks from the jury solely on the basis of race.

The appellant Eiland alone also raises one additional contention:

6. That his inconsistent convictions for murder and accessory after the fact to murder dictate that the sentence for murder should be vacated and the case remanded with instructions to sentence him only on the accessory charge.

### The Factual Background

In assessing the legal sufficiency of the evidence, of course, we take that version of the facts, including the inferences that can fairly be drawn from those facts, that is most favorable to the State's case.

Jay Bias worked at the Hyattsville Branch of the Sovran Bank. On the afternoon of December 4, 1990, two of his coworkers, Andre Campbell and Tydus Mathis, decided to drive to the nearby Prince George's Plaza Mall during their lunch hour. Hearing their plans, Bias asked to accompany them. He had recently purchased from Kay Jewelers, located in the mall, a ring, which was being sized for him and which he wanted to show to his coworkers. The three drove to the mall in Mathis's car. While Mathis went off to browse in another part of the mall, Bias and Campbell went to Kay Jewelers, where they were waited on by Shaunelle Tyler, an employee of the store and the wife of the appellant Jerry Tyler. Bias spoke to Shaunelle Tyler about the ring and showed it to Campbell.

At approximately the same time, the appellants, Jerry Tyler and Gerald Eiland, arrived at the mall in a green Mercedes Benz, owned by Tyler's father but driven by Eiland. The two of them headed directly for Kay Jewelers. As Bias and Campbell were leaving the jewelers, Jerry Tyler entered. He apparently believed that his wife had been flirting with Jay Bias. A turbulent argument ensued between Tyler and his wife, culminating in Tyler's hurling a stapler at her. The manager of Kay Jewelers thought it prudent to end the dispute by escorting Tyler out of the store.

Bias and Campbell, now rejoined by Tydus Mathis, were standing just outside when Tyler was escorted to the exit. Visibly agitated, Tyler turned to Bias and said, "You can have her." Bias replied "that he didn't want [Tyler's] girl" and that "he was just buying a ring." Tyler, his agitation persisting, challenged Bias to "[c]ome on outside, we can take care of this outside." Bias initially started toward Tyler but was stopped by Mathis. During the entire verbal encounter, the appellant Eiland was standing just two to three steps away from Tyler.

Heeding Mathis's advice of restraint, Bias, with Campbell and Mathis, walked toward the mall exit leading to the rear parking lot. The two appellants were making their way

toward another exit, leading to the front parking lot, when Tyler again yelled to Bias to "step outside," adding, "I've got something for you outside; I'll cap you."[1] At that time, Eiland was still standing within two to three feet of Tyler.

As they prepared to leave the parking lot, Mathis was in the driver's seat of his car, Campbell was in the rear passenger compartment, and Bias sat in the front passenger seat. As they approached the exit leading onto Toledo Terrace, they came to a stop in a left-turn lane as they waited for two cars in front of them to make a left turn. At that point, Mathis noticed a green Mercedes "speed" toward them from the opposite side of the parking lot. As the Mercedes pulled abreast of them in the lane to their immediate right, Mathis noticed that Eiland was driving the car and that Tyler was sitting in the front passenger seat. Because the flow of traffic on Toledo Terrace was heavy, Mathis was not able to proceed immediately to exit the parking lot. Indeed, when the Mercedes first pulled abreast of Mathis's Toyota, the Toyota was "stacked up" behind two other cars waiting to make a left-hand turn. The right-hand lane was free, however, and there was nothing to impede the Mercedes, driven by Eiland and occupied by Tyler, from going forward. Eiland, nonetheless, brought the Mercedes to a stop parallel with Mathis' Toyota. When, a few seconds later, the Toyota was able to "inch" forward one automobile length before stopping again, Eiland moved the Mercedes proportionately forward to maintain the parallel relationship between the two cars.

Mathis noticed that the left front window of the Mercedes was open. He saw Eiland press backward against the driver's seat as Tyler stretched across in front of him and yelled out the window. As Eiland pressed his body back against his seat, allowing Tyler to lean across in front of him, his hands were on the low arc of the steering wheel. The testimony was clear that they were not high on the

---

**1.** Translation: "I'll shoot you."

steering wheel or even at midpoint but were as low as they could be without actually releasing the wheel. Campbell, who also observed this, noticed that Tyler had his right hand placed below his knee. Tyler initially appeared "scared" but then became very angry. Because the windows of the Mathis vehicle were closed, neither Mathis nor Campbell could hear the words being yelled by Tyler. As the Mathis vehicle moved slightly forward toward the intersection, Eiland kept the Mercedes parallel with it. As Campbell was briefly turning his head away from the direction of the Mercedes, between seven and ten bullets were fired into the right side of the Mathis vehicle. Two of those bullets struck and mortally wounded Jay Bias.

The Mathis vehicle made an immediate left-hand turn onto Toledo Terrace and drove toward the Leland Memorial Hospital, where Bias was rushed to the emergency room. Shortly thereafter, Bias was pronounced dead by the hospital's attending physicians. Immediately after the shooting, Eiland drove the Mercedes away in an opposite direction from that taken by the Toyota.

### *The Legal Sufficiency of the Evidence*

The test for legal sufficiency of evidence to convict that has always prevailed in Maryland, and is almost universally accepted elsewhere, is the constitutional test for sufficiency under the Due Process Clause clearly spelled out in *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560, 573 (1979):

> "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (emphasis in original).

*Wiggins v. State,* 324 Md. 551, 566–567, 597 A.2d 1359 (1991); *Wilson v. State,* 319 Md. 530, 535–536, 573 A.2d 831 (1990); *Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830 (1980).

■ It is, moreover, clear that the test for legal sufficiency is precisely the same when we are measuring 1) whether the trial judge in a jury trial is in error, as a matter of law, in submitting the case to the jury over a timely defense motion for a judgment of acquittal or 2) whether the trial judge sitting as the fact finder in a court trial is clearly erroneous in rendering a verdict of guilty. In *Bedford v. State*, 293 Md. 172, 174–175, 443 A.2d 78 (1982), the Court of Appeals approved and adopted the analysis made by Judge Orth for this Court in *Williams and McClelland v. State*, 5 Md.App. 450, 458, 247 A.2d 731 (1968), wherein we concluded:

" 'Once the question of the sufficiency of the evidence is properly before us, we believe that the criteria used to determine the question is the same, be the verdict rendered by the court or a jury.' "

*See also Metz v. State*, 9 Md.App. 15, 23, 262 A.2d 331 (1970); *Wilson v. State*, 319 Md. 530, 535–536, 573 A.2d 831 (1990).

Both appellants grasp desperately at straws as they attempt to hang their legal insufficiency claims upon the purported notion that whenever circumstantial evidence forms part of the State's case, a conviction cannot be upheld unless "the circumstances, taken together, are inconsistent with any reasonable hypothesis of innocence." *Wilson v. State*, 319 Md. 530, 537, 573 A.2d 831 (1990). That unfortunate language, which has a vestigial validity in perhaps one percent of the cases in which it is invoked, is profligately bandied about on numberless occasions when it is not remotely apposite.[2]

■ As a general proposition, proof of guilt based in whole or in part on circumstantial evidence is no different from proof of guilt based on direct eyewitness accounts. In *Nichols v. State*, 5 Md.App. 340, 350–351, 247 A.2d 722

**2.** The definitive treatment of this chronically confusing notion is found in the insightful, as well as thorough, analysis by Judge Bloom in *Finke v. State*, 56 Md.App. 450, 465–478, 468 A.2d 353 (1983).

(1968), Judge Orth attempted to lay to rest the ghost of this oft-invoked but seldom pertinent language. Judge Smith, speaking for the Court of Appeals in *Gilmore v. State,* 263 Md. 268, 292–293, 283 A.2d 371 (1971), *vacated in part, Gilmore v. Maryland,* 408 U.S. 940, 92 S.Ct. 2876, 33 L.Ed.2d 763 (1972), quoted with approval and adopted Judge Orth's analysis for us in *Nichols:*

" 'The law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existence of a fact may be inferred. No greater degree of certainty is required when the evidence is circumstantial than when it is direct, for in either case the trier of fact must be convinced beyond a reasonable doubt of the guilt of the accused....

... "[C]ircumstantial evidence need not be such that no possible theory other than guilt can stand.... It is not necessary that the circumstantial evidence exclude every possibility of the defendant's innocence, or produce an absolute certainty in the minds of the jurors." ' " (citations omitted).

Although it might have been more efficacious if Chief Judge Murphy in *Wilson v. State,* 319 Md. 530, 573 A.2d 831 (1990), had simply stomped upon this mischievous language once and for all, he nonetheless effectively cabined it to the rare and unusual situations where it still possesses some residual vitality. He reaffirmed, at 319 Md. 535, 573 A.2d 831, that the *Jackson v. Virginia* standard for legal sufficiency is the ultimate test, whatever the nature of the proof. He reaffirmed that "[a] conviction may rest on circumstantial evidence alone." 319 Md. at 536, 573 A.2d 831. *See also Veney v. State,* 251 Md. 182, 201, 246 A.2d 568 (1968). He reaffirmed the analysis of Judge Smith in *Pressley v. State,* 295 Md. 143, 148–150, 454 A.2d 347 (1983) that, generally speaking, circumstantial evidence is to be analyzed not as a "chain," no stronger than its weakest link, but rather as a "cable," the strength of which does not depend upon a single strand. 319 Md. at 536, 573 A.2d 831.

He reaffirmed the unwavering common denominator of the legal sufficiency measurement:

"[W]hether the evidence is circumstantial or direct, ' "[n]o greater degree of certainty is required ... [because] in either case the trier of fact must be convinced beyond a reasonable doubt of the guilt of the accused." ' "

*Id.* (quoting *Gilmore v. State,* 263 Md. 268, 292, 283 A.2d 371 (1971)).

The small kernel of residual vitality is to be found not in cases where circumstantial evidence of guilt combines with direct evidence of guilt nor even in exclusively circumstantial cases where multiple strands of circumstance point in the same direction, reinforcing and corroborating each other. It is to be found, rather, in those cases where the State's proof of guilt depends exclusively upon a single strand of circumstantial evidence. As part of the very nature of such proof, the circumstance must serve as the predicate for an inference of guilt. The treacherous language (because it is so frequently abused) simply states the truism that a fact finder could not fairly be convinced beyond a reasonable doubt if the circumstantial predicate could also give rise to *reasonable* inferences of innocence. It is self-evident that a finding of guilt based upon a process of elimination must effectively eliminate the other reasonable possibilities. *See, e.g., Tucker v. State,* 244 Md. 488, 224 A.2d 111 (1966).

The classic instance where the concept retains vitality is where the defendant is a workman or other employee whose fingerprint is found in a bedroom from which jewels are stolen. To predicate guilt upon a process of elimination, it is necessary reasonably to eliminate as candidates for the theft those others who also had access to the bedroom. *See Wilson v. State,* 319 Md. 530, 538, 573 A.2d 831 (1990). Until reasonably eliminated, each alternative candidate remains, by definition, a "reasonable hypothesis of [the defendant's] innocence." *See, e.g., Warfield v. State,* 315 Md. 474, 554 A.2d 1238 (1989).

Combine the circumstantial evidence of the fingerprint, however, with direct observations of the defendant's returning to enter the room at an unusual hour of night or of his leaving the room with a bulge in his pocket that was not there before he entered and guilt is no longer dependent upon a single strand of circumstantial evidence. Combine the circumstantial evidence of the fingerprint with other independent circumstantial evidence such as an expressed expectation of imminent wealth made just before the larceny or the display of unusual affluence just after the larceny and guilt is no longer dependent upon a single strand of circumstantial evidence but rather upon a cable made up of multiple strands.

The mere fact that a direct observation may give rise to an inference of greater legal significance, moreover, does not transmute direct evidence into circumstantial evidence. Almost every murder verdict, for instance, infers an intent to kill from the observed directing of a deadly weapon at a vital part of the human anatomy. Such eyewitness murders do not thereby become cases of circumstantial evidence.

In the cases at bar, this whole concept of having to eliminate all reasonable hypotheses of innocence when a case is based *solely* on circumstantial evidence is not remotely apposite. Neither the case against Tyler nor the case against Eiland is based exclusively upon a single strand of circumstantial evidence. Neither case, moreover, is based upon even multiple strands of circumstantial evidence. Both cases rest not only in part but almost exclusively upon direct evidence.

■ In the case against Tyler, eyewitnesses described the fight between Tyler and his wife. Eyewitnesses described Tyler's anger at Jay Bias, whom Tyler obviously believed to have been flirting with his wife. Eyewitnesses described Tyler's challenge to Bias to "come outside and settle this." An eyewitness described Tyler's direct threat to shoot Bias (to "cap" him) just minutes before he did just that. Eyewitnesses described his speeding across the parking lot in a

car driven by his confederate to intercept the vehicle carrying Bias. Eyewitnesses described his leaning angrily toward the open window of the Mercedes and his reaching for something down at his knee-level. Eyewitnesses described seven to ten gunshots immediately ringing out. Eyewitnesses described the fatal consequences of two bullets striking the body of Jay Bias. There was nothing remotely circumstantial about the evidence of Tyler's guilt.

Tyler's argument that Eiland, rather than Tyler, must have done the shooting because 1) at five feet, seven inches of height, his (Tyler's) arms were too short to have permitted him to reach with a gun out the driver's window from the passenger side and 2) he could not have fired from within the car because a) the flash would have burned Eiland, who was not burned; b) the report would have deafened Eiland, who was not deafened; and c) the shell casings would have been ejected inside the car, which they were not is simply an ingenious jury argument and we are not jurors.

In the case against Eiland, eyewitnesses described his close association with Tyler at all critical times. Eyewitnesses described his being present when the verbal altercation between Tyler and Bias took place. Eyewitnesses described his close proximity to Tyler when Tyler threatened to "cap" Bias. Eyewitnesses described his speeding across the parking lot to intercept the vehicle containing Bias. Eyewitnesses described his bringing of the Mercedes deliberately abreast of the Bias vehicle and then maintaining that parallel position. Eyewitnesses described his pressing backward against the seat and his lowering of his arms to take himself out of the line of fire. Eyewitnesses described his then taking off in an opposite direction. There was nothing remotely circumstantial about the evidence of Eiland's guilt as an aider and abettor.

Neither the case against Tyler nor the case against Eiland was based upon circumstantial evidence at all. *A fortiori,* neither was based *solely* upon circumstantial evi-

dence generally. *A fortiori*, neither was based *solely* upon a single strand of circumstantial evidence. All talk, therefore, about having to eliminate all reasonable hypotheses of innocence, as some kind of supplemental test superimposed upon the ordinary legal sufficiency test, is irrelevant fantasy.

## The Severance Issue

Each appellant claims that Judge Johnson erroneously refused his motion to have his trial severed from that of his co-defendant. There is no shred of merit in the contention. Maryland Rule 4–253(a) provides:

> "On motion of a party, the court may order a joint trial for two or more defendants charged in separate charging documents if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses."

Both Tyler and Eiland were, in separate charging documents, alleged to have participated in the same act, to wit, the murder of Jay Bias. The State, a party, moved for a joint trial. Judge Johnson granted the motion. The terms of Rule 4–253(a) were eminently satisfied.

Rule 4–253(c) goes on to provide, in pertinent part: "If it appears that any party will be prejudiced by the joinder for trial of ... defendants, the court may ... on motion of any party, order separate trials of ... defendants ..."

The necessary precondition for the granting of a trial severance is the likelihood of prejudice. What then, under the law of this state, does that term of art "prejudice" mean? Has either appellant suffered "prejudice," as defined by Maryland law?

The case law is unequivocal. "Prejudice as a term of art means damage from inadmissible evidence, not damage from admissible evidence." *Sye v. State*, 55 Md.App. 356, 362, 468 A.2d 641 (1983). In *Osburn v. State*, 301 Md. 250, 254–255, 482 A.2d 905 (1984), the Court of Appeals quoted

this passage from *Sye v. State* with approval, as it further observed, at 301 Md. 254, 482 A.2d 905:

"In *McKnight v. State,* 280 Md. 604, 375 A.2d 551 (1977), we established the general test for the joinder/severance of multiple defendants ...; the evidence offered must be *mutually admissible* as to each defendant ... for joinder to be proper." (emphasis supplied).

■ So long as *most* of the evidence at a joint trial is mutually admissible against both defendants, joinder is proper. As Judge Bloom recently noted for this Court in *Cook v. State,* 84 Md.App. 122, 130, 578 A.2d 283 (1990):

"[J]oinder of defendants for trial is favored for reason of judicial economy ... and is appropriate 'where most, if not all, of the evidence admitted at trial would have been admissible in each trial if the several defendants had been tried separately.' *Stevenson v. State,* 43 Md.App. 120, 130, 403 A.2d 812, *aff'd,* 287 Md. 504, 413 A.2d 1340 (1979)....

Here, there was no prejudice to either appellant in the refusal to sever their trials on the charges lodged against them jointly. Any evidence that was admissible against either appellant on *those* charges would be admissible against both." (emphasis in original).

*See also McKnight v. State,* 280 Md. 604, 375 A.2d 551, 554 (1977); *Stevenson v. State,* 43 Md.App. 120, 130, 403 A.2d 812 (1979), *aff'd, Stevenson v. State,* 287 Md. 504, 413 A.2d 1340 (1980); *Johnson v. State,* 38 Md.App. 306, 310–311, 381 A.2d 303 (1977); *McCree v. State,* 33 Md.App. 82, 92–93, 363 A.2d 647 (1976); *Mason v. State,* 18 Md.App. 130, 141, 305 A.2d 492 (1973); *Peterson v. State,* 15 Md.App. 478, 496, 292 A.2d 714 (1972); *cf. Tracy v. State,* 319 Md. 452, 458, 573 A.2d 38 (1990).

■ This possibility of significant damage to a defendant by evidence inadmissible as to him but admissible against a codefendant is the only criterion for measuring joinder/severance ever recognized by Maryland law. Unless damaging evidence is not mutually admissible, a trial severance is,

indeed, contraindicated. As we stated in *Ball v. State,* 57 Md.App. 338, 353, 470 A.2d 361 (1984) (emphasis supplied), "A severance is called for *only* when a defendant will be significantly prejudiced by evidence admissible against a codefendant but not admissible against him."

According to this exclusive criterion, the appellants did not remotely qualify for a trial severance. Not simply *most* (which would be enough) but, indeed, *all* of the evidence was mutually admissible against both Tyler and Eiland. We would have no difficulty affirming Judge Johnson's decision to deny severance even by the more rigorous "right or wrong" standard of review. *A fortiori,* his decision cannot fail to be affirmed by the far more deferential "clear abuse of discretion" standard. Accordingly, we affirm.

Resiliently, however, the appellants continue to squirm even when they are clearly down. Out of thin air, they attempt to confect an additional criterion for measuring joinder/severance—"hostility between the defenses." Ingeniously, they have combed the case law and uncovered four instances where, in passing *dicta,* the phrase "hostile defenses" has actually been uttered.[3] Those passing utter-

---

3. In *Jones v. State,* 185 Md. 481, 487, 45 A.2d 350 (1946), the denial of a severance was a passing and peripheral "other" contention. In a brief paragraph, the Court of Appeals disposed of it summarily. Noting that the same lawyer represented both codefendants, it observed with no further comment, "There was no intimation that the defense of the respective defendants was hostile."

*Day v. State,* 196 Md. 384, 76 A.2d 729 (1950) was a pre-Bruton case with a Bruton problem. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In a capital case, two co-defendants gave a total of five confessions. Neither defendant took the stand, creating classic confrontation problems. Each defendant, in his confessions, cast full blame on the codefendant. The primary evidence of guilt against each defendant was the inadmissible (as to that defendant) confession of the codefendant. The denial of a severance was clearly erroneous under settled law and the occasional use of the adjective "hostile" on several occasions in the course of a lengthy narrative and discussion did not remotely suggest some additional or alternative test.

ances, however, had been in the context of mutually inadmissible and damaging evidence actually introduced. In context, of course, the phrase did not articulate some new and different test but simply described long settled Maryland law. What the appellants are attempting to do is to treat the adjective "hostile" as a free-floating phenomenon—to remove it from the context of mutually hostile actual evidence and then to build around it, as it floats free, a new context consisting of mutually hostile jury arguments, mutually hostile insinuations, and mutually hostile tones on cross-examination.

Of the four opinions relied upon by the appellants as ostensible authority for the very existence of an additional joinder/severance criterion simply because of their inconsequential inclusion of the phrase "hostile defenses," it must be pointed out that in three of them the denial of a severance was summarily affirmed as non-error. *Jones v. State,* 185 Md. 481, 487, 45 A.2d 350 (1946); *Williams v. State,* 226 Md. 614, 621, 174 A.2d 719 (1961); *Laws and Dorman v. State,* 6 Md.App. 243, 248, 251 A.2d 237 (1969). In the fourth, *Day v. State,* 196 Md. 384, 76 A.2d 729 (1950), the decision that severance had been erroneously denied turned upon the fact that inadmissible hearsay (confessions of a codefendant) was admitted into evidence to the extreme prejudice of both defendants.

*Laws and Dorman,* moreover, makes it very clear that when *Day v. State* used the notion of hostile defenses, it was referring to nothing beyond the actual introduction of

---

*Williams v. State,* 226 Md. 614, 621, 174 A.2d 719 (1961) was another occasion where the severance issue was a passing "other" contention disposed of summarily by a brief paragraph. Distinguishing its situation from that in *Day v. State, supra,* it simply observed, "This is not a case where the defenses were hostile or where confessions had been obtained, which might be inadmissible to some of the defendants. *Cf. Day v. State,* 196 Md. 384 [76 A.2d 729]."

*Laws and Dorman v. State,* 6 Md.App. 243, 248, 251 A.2d 237 (1969) uses the phrase "defenses hostile to each other" but, as will be discussed in the text of this opinion, in a way that flatly repudiates the use the appellants seek to make of the phrase.

inadmissible and prejudicial evidence. In distinguishing *Day v. State,* it held that the appellants in its case could not avail themselves of a severance argument for the sole reason that they had not presented any evidence:

"The appellants rely on *Day v. State* ... where the Court of Appeals found abuse of discretion where the codefendants had defenses *hostile* to each other *in that each tended to blame the other* for the killing during a felony. *Since neither Laws nor Dorman presented any evidence at the conclusion of the State's case it is apparent that Day v. State, supra, has no application here."* (emphasis supplied).

6 Md.App. at 248, 251 A.2d 237.

In *Sye v. State,* 55 Md.App. 356, 468 A.2d 641 (1983), one of the appellants made the very argument made by the appellants here—that severance was necessary "because his version of the altercation that led to the killing differed from the versions given by his codefendants." 55 Md.App. at 361, 468 A.2d 641. We rejected the argument, observing at 55 Md.App. 362, 468 A.2d 641:

"Where the codefendant who gives the damaging version actually takes the stand and testifies ... there is no problem. The testimony, though damaging to be sure, is competent and, therefore, admissible. Prejudice as a term of art means damage from inadmissible evidence, not damage from admissible evidence." (footnote omitted).

The mere fact that a joint trial may place a defendant in an uncomfortable or difficult tactical situation does not compel a severance. Only the threat of damaging inadmissible evidence does that:

"The pertinent question is not whether the State might have had, in some other procedural configuration, a more difficult time in obtaining the testimony of Brooks and Sye. The pertinent question rather is whether the testimony of Brooks and Sye was competent and admissible. It clearly was. Bates was damaged but the damage was legitimate. He received a fair trial with the State using

only admissible evidence. The State did not offer any evidence admissible against the others but inadmissible against Bates."

55 Md.App. at 363, 468 A.2d 641.

The same argument was also before us on yet an earlier occasion. We rejected it, speaking through then Chief Judge Murphy, in *Lipscomb v. State,* 5 Md.App. 500, 248 A.2d 491 (1968). In a joint trial of two codefendants for rape, one claimed that the sexual intercourse was completely consensual. He was understandably chagrined by his codefendant's starkly contrasting testimony that the victim had struggled and the codefendant had been enlisted to help hold her down. Lipscomb claimed that the testimony of the codefendant was prejudicial. We pointed out that prejudice consists not of being damaged or incriminated by the evidence but only of being damaged or incriminated by evidence that is inadmissible.

Our decision in *Moore v. State,* 84 Md.App. 165, 578 A.2d 304 (1990) is dispositive. Two codefendants, joined for trial over their objections, claimed that "their defenses were incompatible (i.e., each defendant attempted to prove at trial that the other was solely responsible) and, therefore, prejudicial." 84 Md. at 169. In rejecting the argument, Chief Judge Gilbert held for the Court:

"*Each appellant contends* that he was prejudiced by the joinder because *each had defenses hostile to the other. The case law in Maryland, however, does not sweep as broadly as appellants think it does.* A defendant is deemed to have been prejudiced by a joint trial when the joining of a co-defendant or co-defendants (1) permits the State to introduce, against a particular defendant, otherwise inadmissible evidence, and (2) that otherwise inadmissible evidence tends to contradict the defendant's theory of the case.

The permitted joinder in both *Day* and *Erman* allowed the State to introduce evidence against one defendant that could not have been introduced against him had he been tried separately. Moreover, the evidence which was

otherwise inadmissible contradicted the defendant's evidence, thereby prejudicing him.

The joinder in the case at bar did not produce that result. The evidence admitted at trial would have been admissible against each co-defendant, irrespective of whether they received separate trials...." (emphasis supplied).

84 Md.App. at 169, 578 A.2d 304. Judge Johnson did not abuse his discretion in denying the severance.

▆▆ Tyler argued, incidentally, that because of the joint trial, "the jury was so confused that it returned a verdict which was inconsistent externally as between the defendants.... While Tyler was found guilty of first-degree premeditated murder, Eiland was found to have aided and abetted in a second-degree specific intent murder.... Thus, even though Tyler has been found guilty of first-degree premeditated, the jury found Eiland guilty only of aiding and abetting a second-degree murder."

What was in the second degree, of course, was not a "murder" (an act of homicide itself has no level of moral blameworthiness) but rather Eiland's "aiding and abetting" of it. Eiland's level of guilt and Tyler's level of guilt were totally independent of each other *Cf. State v. Raines*, 326 Md. 582, 606 A.2d 265 (1992). There was nothing incongruous in Eiland's being guilty of murder in the second degree as an aider and abettor to Tyler's, the triggerman's, murder in the first degree.

When a single crime has different levels of blameworthiness dependent upon the level of moral depravity of the perpetrator, all participants, at whatever level, share in a single and immutable *actus reus;* their individual mind sets or *mentes reae*, however, may rise or fall quite independently of each other. Thus, the triggerman may have premeditated the killing (first degree); one aider and abettor may have formed the intent to kill only at the last moment or, indeed, have intended only grievous bodily harm (second degree); while a second aider and abettor, a cuc-

kolded spouse perhaps, may have been acting in hot-blooded response to provocation (manslaughter). As we move from triggerman to accomplice, moreover, the levels of blame-worthiness may be ascending as well as descending. Among mutual participants, the only expected common denominator is the *actus reus*. Their intents may be randomly idiosyncratic.

### *The Dying Words: An Implied Assertion of a Deteriorating Condition*

Immediately after the shooting, Campbell raced the Toyota toward the Leland Memorial Hospital. The trip took "no more than three minutes." By the time the car reached the hospital, however, Jay Bias could no longer respond verbally. "He had like foam coming out of his mouth." Both Campbell and Mathis described Bias's utterances in the course of that three-minute ride.

Mathis had been hit in the face by flying glass and dropped to the floor of the back seat, thinking he himself might have been shot. When asked "What happened next?," he replied:

"At that point Jay started replying that he had got shot. He asked Tydus to take both of us to the hospital, 'Get us to the hospital. Get us to the hospital.' And then he started saying that he's not going to make it. 'We ain't going to make it.' And then he said he loved his mother and his father, and then he said the Lord's Prayer."

Campbell described Bias's first words after the shooting:

"At the time he was saying, 'Take me to the hospital. Take me to the hospital.'"

He went on to testify that by the time they got to East–West Highway, the tone of Bias's statements had changed dramatically:

"He had stated to me at that time, he said, 'Just tell my mother and father and my sister and brother and Shelley that I love them,' and I said, 'Jay, don't talk like that. Don't you die on me. Hang in there. We're going to be

at the hospital in a few minutes.' And then he started reciting the Lord's Prayer, and from there I just stepped on the gas because I felt like he knew."

Both appellants objected to the accounts of Bias's last words on the grounds that they were inadmissible hearsay, were irrelevant and were inflammatory.

Several questions are involved. Were those out-of-court utterances hearsay at all? Were the utterances actually assertions of anything? If so, what were those assertions offered to prove? Were they relevant to prove it? Were there sufficient guarantees of trustworthiness to support the declarant's credibility?

To begin with credibility, there were redundantly overlapping guarantees of trustworthiness. One can in this case readily understand the nostalgic tug of the now discredited and much maligned term "res gestae." *Cassidy v. State*, 74 Md.App. 1, 9–16, 536 A.2d 666 (1988). More sophisticated modern analysis, of course, has unravelled that previously undifferentiated umbrella concept into between seven and ten separate evidentiary rules. *Cassidy*, 74 Md.App. at 12–14, 536 A.2d 666. The dying words of Bias would qualify as trustworthy under as many as four of those now autonomous exceptions, none of them ironically being the dying declaration.

 The declarations, made while racing to the hospital within a minute or two of being mortally wounded and while in the grips of both physical pain and despair of impending death, are a textbook example of every type of excitement that could ever inhere in an excited utterance. L. McLain, *Maryland Evidence* § 803(2).1, at 349–352 (1987 & Supp.1990); *Cassidy v. State*, 74 Md.App. at 16–23, 536 A.2d 666. Beginning with "I've been shot" through "We're not going to make it," the declarations are also quintessential present sense impressions. *Booth v. State*, 306 Md. 313, 508 A.2d 976 (1986); *State v. Jones*, 311 Md. 23, 532 A.2d 169 (1987); L. McLain, *Maryland Evidence* § 803(1).1, at 343–346. The assertions, express and implied, are, more-

over, classic illustrations of a statement of present bodily condition, sometimes referred to as a statement of pain and suffering. L. McLain, *Maryland Evidence* § 803(3).2, at 363–364; *Cassidy v. State*, 74 Md.App. at 23–25, 536 A.2d 666; *Geiselman v. Schmidt*, 106 Md. 580, 584, 68 A. 202, 204 (1907); *Pennsylvania R.R. v. Simmons*, 159 Md. 114, 121, 150 A. 263, 265–266 (1930). As expressions of an awareness of immediately impending death, the utterances are also statements of a present mental or emotional state. L. McLain, *Maryland Evidence* § 803(3).1, at 356–363; *Nash v. State*, 69 Md.App. 681, 690–691, 519 A.2d 769, 773 (1987). The credibility or trustworthiness hurdle is cleared with room to spare in four separate ways.

Quite aside from credibility, however, were the utterances actually hearsay? Even to be characterized as hearsay, of course, the statements must be assertive and must, furthermore, be offered to prove the truth of the thing asserted. The dying words of Jay Bias certainly were not *direct* assertions within the contemplation of the hearsay rule. "I've been shot" and "Tell my mother and father that I love them," though assertions in a sense, were not here offered for the truth of the things directly asserted. The fact that Bias had been shot was not in dispute and his love for his parents was not in issue. The Lord's Prayer, moreover, is not assertive at all but is, rather, a series of exaltations of praise and appeals to divine grace.

Those utterances nonetheless qualify as hearsay as instances of the far less frequently observed evidentiary phenomenon of the implied assertion. L. McLain, *Maryland Evidence* § 801.4, at 275:

> "At common law, out-of-court 'statements' within the hearsay definition also include implied assertions. When evidence of either verbal or nonverbal conduct is offered to prove that the declarant or actor had a particular belief and that that belief was correct, the hearsay rule will apply." (footnote omitted).

*See also Wright v. Tatham,* 7 Adolph & 313, 112 Eng.Rep. 488 (Exch.Ch.1837) and 5 Cl. & F. 136 (H.L.1838). *And see Waters v. Waters,* 35 Md. 531, 544–45 (1872) (expressly adopting the holding of *Wright v. Tatham* as part of Maryland law). The implied assertion may be verbal or non-verbal. The sea captain's taking on board of his wife and children is an implied assertion of his belief in his vessel's seaworthiness. *See* L. McLain, *Maryland Evidence* § 801.4, at 275. The raising of an umbrella is an implied assertion that it is raining. *See* Falknor, *The "Hear–Say" Rule as a "See–Do" Rule: Evidence of Conduct,* 33 Rocky Mountain L.Rev. 133 (1961).

By parity of reasoning, a last wish to a companion to pass on one's final expression of love to a mother and a father and then the reciting of the Lord's Prayer are implied assertions of the fact "I'm dying," particularly when they closely follow an earlier and more optimistic "Get me to the hospital" countered shortly by the growing apprehension "We're not going to make it."

 Even credible hearsay, however, must also be relevant. What relevance, finally, had Jay Bias's implied assertion, tragically quite accurate, that he was dying. Though not medically expert, to be sure, Jay Bias's direct observations of his own condition—his pain, his sense of where the bullets hit, his sinking feeling, his waning consciousness— were, albeit non-expert, some relevant evidence of that condition.

 In terms of materiality, that condition was placed squarely in issue by the appellant Tyler. At a pretrial motions hearing on April 11, 1991, Tyler requested a continuance in order to pursue his intended "intervention defense." The thrust of that defense was clear. As Tyler's counsel explained it:

"We have taken the medical records from the hospital dealing with the treatment of Mr. Bias, we have taken the autopsy report, and we have presented them to a distin-

guished forensic pathologist, and he has given me the following opinion:

, He has basically stated that when Mr. Bias was taken to the hospital, he was a wounded man who could have and should have survived, and *it was not the bullet that killed Mr. Bias, it was the medical treatment that he received at Leland Memorial Hospital that killed him,* that took his life.

There is in the law, with respect to homicide prosecutions, a defense known as, "Intervention," and if we can establish and convince the trier of fact that Mr. Bias was a wounded man who could have and should have survived, but that because of the treatment he received at the hospital, and as a result of the treatment he received at the hospital, he didn't survive, that would be a valid and bona fide defense of this case." (emphasis supplied).

At another hearing just prior to the start of the trial, the issue arose of whether Tyler would be permitted to allude to his intervention defense in his opening statement to the jury. Three times Tyler's counsel was pressed as to whether he intended to raise the intervention defense. Twice he avoided the question. The third time, he equivocated:

"THE COURT: Mr. Houlon, I'm not going to get into an argument with you. My question is do you intend to raise that issue?

MR. HOULON: I don't know if I'm going to be able to at this point."

Tyler's counsel did indicate, however, that his potential use of the defense was still a very real possibility:

"I did speak with an individual who is a former medical examiner and who is a general surgeon. He did review the autopsy report. He did review the hospital medical records, and his preliminary theoretical feeling about the case was the same as that of the forensic pathologist that I spoke with prior to the motions hearing week before last, and that was *that perhaps but for the medical care, Mr. Bias would be alive today.* And he last evening told me that he would see what he could do about either

making a decision to testify, or perhaps find a shock trauma specialist who would take an interest in the case, and look at the medical records." (emphasis supplied). With no expert yet subpoenaed, Tyler was not permitted to raise the defense in his opening statement. Tyler indicated that he might well try to establish the defense through his cross-examination of the medical examiner and the hospital physician. He did not, moreover, completely back off from the possibility of injecting it somehow into his opening statement to the jury:

"MR. HOULON: Your Honor, these are the State's witnesses: The medical examiner, and I assume that the State is expecting to call the hospital physician.

THE COURT: Your first question was whether or not you would be able to bring it up in your opening statement.

MR. HOULON: Yes, sir.

THE COURT: All right. I don't mind your cross examining anyone on what they have testified on, so long as it is within the scope of their direct testimony. That is no problem.

MR. HOULON: That's all I'm asking.

THE COURT: All right.

MR. HOULON: Thank you.

THE COURT: But *I still don't see how you're going to bring it up as an affirmative defense in your opening statement.*

MR. HOULON: *Well, I'll just have to reach down into my creativity box, Your Honor, and see what I can do.*" (emphasis supplied).

At trial, Tyler's counsel cross-examined the State's medical witnesses—including Dr. Alzamora, the attending physician at Leland Memorial Hospital—extensively in an effort to support the intervention defense.

Notwithstanding Tyler's protestation in his reply brief that "the issue was never raised by Defendant's counsel

before the jury," he nonetheless sought, unsuccessfully, a jury instruction on the intervention defense:

"MR. HOULON: *We would ask for an intervention instruction* based on the following: Dr. Alzamora's theory was that the hilum of the lung was smashed, and that allowed the air and the blood to mix together in enormous quantities, and most likely an air bubble went to the brain or the heart muscle and killed Mr. Bias.

Dr. Golle testified that the hilum was intact, and that the gentleman bled to death, and I think it's almost axiomatic that you don't have a punctured lung while you're in a hospital and bleed to death, and *we think that that is sufficient grounds for an intervention instruction.*" (emphasis supplied).

Faced throughout the trial with the ever present menace of that defense being developed and/or asserted, the State was well advised to try to forfend it by offering evidence (Bias's belief that he was dying) from which it might be inferred that Bias was dying even as he sped toward the hospital. This was evidence to counter Tyler's threatened argument that it was not Tyler's bullets but medical malpractice that killed Jay Bias.

Eiland, for his part, would like to have his cake and eat it too. On April 23, he asserted, "I'm not raising that defense," although on April 11, he had taken a very different tack:

"THE COURT: Do you have anything you want to say?

MR. GOLDSTEIN: No, but if he develops this defense, I would sincerely join in it."

The issue was there in Eiland's case, however, whether he affirmatively raised it or not.

 In his reply brief, Eiland protests that the evidence of Bias's dying words was not "in any way probative of Eiland's guilt or innocence." To be sure, it did not establish his criminal agency. It most definitely had a bearing, however, upon the establishment of the *corpus delicti*.

Proof of Eiland's guilt was inexorably intertwined with proof of Tyler's guilt. The success of the intervention defense would not have benefitted Tyler alone. Eiland would necessarily have "piggybacked" upon it. If the cause of death had been determined to have been not Tyler's bullets but medical malpractice, Eiland would have "walked" out of the courtroom with Tyler. As a principal in the second degree, Eiland only aided and abetted in whatever Tyler's *actus reus* may have been. Self-evidently, Eiland did not aid and abet the attending physicians at the Leland Memorial Hospital. Eiland did not need to raise the defense. It was there in any event.

### *Batson v. Kentucky Gender–Based Peremptories*

Both appellants claim that the State unconstitutionally used peremptory challenges to strike prospective female jurors solely on the basis of their gender in contravention of the Equal Protection Clause of the Fourteenth Amendment as applied to the use of peremptory challenges by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

The appellants' factual predicate is correct. Although the intimations in the appellate briefs are that the petit jury that was ultimately seated was more heavily female than male, the actual makeup of the jury is not before us in this record.[4] It was nonetheless clear that gender was one of the factors guiding the State's exercise of its peremptories. It seems to be uncontested that the State used 16 of its 20 peremptory challenges to strike females. The other four were used to strike males. Of the sixteen women who were challenged by the State, incidentally, eleven were black, four were white, and one was Asian.

The number of peremptories used means nothing, of course, standing alone. *Bailey v. State*, 84 Md.App. 323, 332–333, 579 A.2d 774 (1990). A pattern does emerge,

---

**4.** The uncontradicted recollection of the prosecutor during one hearing was that eight women and four men composed the ultimate jury, with the three alternates all being women.

however, when the 16 strikes are viewed in relation to the apparently uncontested compilation made by counsel for Eiland. After the challenges for cause had been completed, 80 venire panel members remained in the available jury pool. Forty-four, or 55% of them, were female. Thirty-six, or 45%, were male. We can only use the remaining available jury pool as an approximate common denominator because we have no breakdown according to gender of the prospective jurors actually called to be accepted or challenged. Using that admittedly imprecise denominator, however, we do have the State using 16 challenges where random selection would have predicted only 11. 80% of its challenges directed against 55% of the jury pool is a proportion of challenges against a particular group 50% greater than random selection would suggest. A pattern clearly was present.

Quite candidly, moreover, the State acknowledged its purpose: "As a general theory of the State's case, the State wanted more men on this case, and wanted older as opposed to younger;" "I was trying to get older people in the jury, and more men." Although the State attributed none of its strikes to gender alone, gender appeared some six or seven times as one of the factors in a two or three-factored strike. Four or five times the explanation was the double-barreled combination of the prospective juror's being "a young female."

### A. The Federal Issue:

██ The key issue here, however, is not factual but legal. Neither *Batson* nor any of its progeny have thus far dealt with any limitation on the otherwise unfettered nature of peremptory challenges except those based on race. *Batson v. Kentucky, supra; Powers v. Ohio,* 499 U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); and *Edmonson v. Leesville Concrete Co.,* 500 U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) all involved peremptories aimed at black jurors. *Hernandez v. New York,* 500 U.S. ——, 111 S.Ct.

1859, 114 L.Ed.2d 395 (1991) involved peremptories aimed at Latino or Hispanic jurors.

As a matter of intellectual conjecture, it is hard to imagine how the scrutiny of the Equal Protection Clause could stop at discrimination aimed only at blacks and Hispanics rather than being aimed at racially motivated peremptories used against members of any race. It is hard to imagine why it should not also be aimed at gender-based peremptories directed at women—or at men. It is hard to imagine that it should not be aimed at peremptories based upon a juror's religion.

By the same token, it is difficult to reconcile the potentially grand sweep of the Equal Protection Clause with the Supreme Court's repeated protestations that it was carving out a limited exception to the otherwise peremptory character of the peremptory challenge and the Supreme Court's continuing homage to the value of the peremptory challenge. "[T]he peremptory challenge occupies an important position in our trial procedures." *Batson v. Kentucky*, 476 U.S. at 98, 106 S.Ct. at 1724. "[W]e do not agree that our decision today will undermine the contribution the challenge generally makes to the administration of justice." 476 U.S. at 98–99, 106 S.Ct. at 1724. One cannot help but wonder whether the Supreme Court, when it unlimbered the heavy artillery of the Equal Protection Clause against one particular and invidious social problem in *Batson,* fully realized the forces it was unleashing and the possible repercussions in fields far removed from race. Did the Supreme Court intentionally venture out onto a slippery slope that has no principled stopping place short of the effective elimination of the peremptory challenge despite its continued lip service to the peremptory challenge or will the Court draw a line, even if it turns out to be an arbitrary line? The obvious answer is that no one knows.

Some jurisdictions have, indeed, anticipated that the Supreme Court will extend the strictures of *Batson v. Kentucky* to gender-based peremptory challenges. The most recent is the *en banc* decision of the United States Court of

Appeals for the Ninth Circuit in *United States v. De Gross,* 960 F.2d 1433 (9th Cir.1992). It struck down as unconstitutional both the female defendant's peremptory challenge of a male juror *and* the prosecution's peremptory challenge of a female juror. *See also People v. Blunt,* 162 A.D.2d 86, 561 N.Y.S.2d 90 (App.Div.1990); *Commonwealth v. Hyatt,* 409 Mass. 689, 568 N.E.2d 1148 (1991); *State v. Gonzales,* 111 N.M. 590, 808 P.2d 40 (App.1991); *DiDonato v. Santini,* 232 Cal.App.3d 721, 283 Cal.Rptr. 751 (1991).

Other jurisdictions, however, have held that *Batson* applies only to peremptories based upon race. *State v. Oliviera,* 534 A.2d 867, 869–870 (R.I.1987); *State v. Pullen,* 811 S.W.2d 463 (Mo.App.1991); *Dysart v. State,* 581 So.2d 541 (Ala.Cr.App.1990); *State v. Culver,* 233 Neb. 228, 444 N.W.2d 662 (1989); *Hannan v. Commonwealth,* 774 S.W.2d 462 (Ky.App.1989). In *United States v. Hamilton,* 850 F.2d 1038 (1988), the Court of Appeals for the Fourth Circuit declined to extend *Batson* to gender-based peremptories. In trying to fathom the intent of the Supreme Court, it distinguished equal protection law generally from the "unique situation" involved with peremptory challenges and racial discrimination:

> "Although the Court in Batson relaxed the evidentiary burden of Swain, it offered no intimation that it was extending the equal protection safeguards involving peremptory strikes to gender: 'By requiring trial courts to be sensitive to the racially discriminatory use of peremptory challenges, our decision enforces the mandate to equal protection and furthers the ends of justice.' 106 S.Ct. at 1724 (emphasis added). While the strictures of the Equal Protection Clause undoubtedly apply to prohibit discrimination due to gender in other contexts, *there is no evidence to suggest that the Supreme Court would apply normal equal protection principles to the unique situation involving peremptory challenges.*" (emphasis supplied).

850 F.2d at 1042. Taking the Supreme Court's homage to the value of the peremptory challenge at its word, the

Fourth Circuit could not conclude that the Supreme Court intended, in effect, to destroy the peremptory challenge:

"Clearly, if the Supreme Court in Batson had desired, it could have abolished the peremptory challenge or prohibited the exercise of the challenges on the basis of race, gender, age, or other group classification. A careful examination of the Batson opinion, however, leads this Court to the firm conclusion that, in light of the important position of the peremptory challenge in our jury system, *the Court intended Batson to apply to prohibit the exercise of peremptory challenges on the basis of race only.*" (emphasis supplied).

*Id.* at 1042–1043.

In the last analysis, it is a decision of the Supreme Court that we are dealing with. To enlarge dramatically the contours of that decision and to push out its rationale into new and uncharted waters would be presumptuous on our part. We find comfort instead in the cautious discretion counseled by the Court of Appeals in *State v. Gorman,* 315 Md. 402, 415–416, 554 A.2d 1203, 1209 (1989), *vacated on other grounds,* —— U.S. ——, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991), in dealing with a slightly different but analogous invitation to "push out the envelope" of *Batson:*

"We have learned that it is not wise to prophesy what the Supreme Court will do or anticipate how it will rule when an unresolved question comes before it. We are content, as was the Supreme Court, to leave the determination of issues unresolved in *Batson* to future litigation. It is apparent that what spurred *Batson* was the Court's belief 'that the practice of peremptorily eliminating *blacks* from petit juries in cases with *black defendants* remains widespread....' It was this discriminatory practice which the Court addressed and sought to remedy. The venerable concept of the peremptory challenge in other respects was left intact. The majority expressed its recognition 'that the peremptory challenge occupies an important position in our trial procedures....' It did 'not agree that [its] decision today will undermine the contri-

bution the challenge generally makes to the administration of justice.'

We decline to go further than did the Supreme Court. The circumstances here were unlike those in *Batson*." (citations omitted) (emphasis in original).

### B. The State Issue:

■ The appellants also invite us to rule that peremptory challenges based on gender are unconstitutional under Article 46 of the Maryland Declaration of Rights, which provides:

"Equality of rights under the law shall not be abridged or denied because of sex."

If we were persuaded that the glare of equal protection should properly focus upon the use of peremptory challenges in the context of a single case, we would not hesitate to declare that gender bias is just as invidious as racial bias. The appellants may not merely invite us, however, to extend *Batson*. They must first persuade us to adopt *Batson* as a part of Maryland law. We are not persuaded to do so. We follow *Batson* because we must, not because we are persuaded that it was a well-advised decision.

If an act of the Maryland Legislature, providing for the selection of grand or petit jurors, denied or abridged the equality of rights because of sex, we would not hesitate to strike it down. *Cf. Strauder v. West Virginia*, 100 U.S. (10 Otto) 303, 25 L.Ed. 664 (1879). If a prosecuting attorney on a recurring and systematic basis abused the use of peremptory challenges, using them persistently even when it damaged his tactical position, in order to perpetuate a regime of inequality based on sex, we would not hesitate to strike it down. *Cf. Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Unlike the Supreme Court, however, we are not persuaded that the use of peremptories, on an *ad hoc* basis, to gain a hoped-for tactical advantage in the context of a single case will always offend notions of equal protection. When mere trial tactics rather than systematic oppression are involved, today's target group may be tomor-

row's favored group with random interchangeability. That is inherent in the very nature of the peremptory challenge and that is not an equal protection concern.

The *Batson* principle, arguably ill-advised if for no other reason than because of its tendency to over-breadth, is not and never has been a part of Maryland law. We cannot extend what we have never adopted. *Stanley v. State*, 313 Md. 50, 542 A.2d 1267 (1988); *Tolbert v. State*, 315 Md. 13, 553 A.2d 228 (1989); *State v. Gorman*, 315 Md. 402, 554 A.2d 1203 (1989); *Chew v. State*, 317 Md. 233, 562 A.2d 1270 (1989); and *Gray v. State*, 317 Md. 250, 562 A.2d 1278 (1989) have applied federal law. The decisions of this Court have similarly confined themselves to the mandate of *Batson*. *Chew v. State*, 71 Md.App. 681, 527 A.2d 332 (1987); *Parker v. State*, 72 Md.App. 610, 531 A.2d 1313 (1987); *Simpkins v. State*, 79 Md.App. 687, 558 A.2d 816 (1989); *Bailey v. State*, 84 Md.App. 323, 579 A.2d 774 (1990); *Stanley v. State*, 85 Md.App. 92, 582 A.2d 532 (1990); *Adams v. State*, 86 Md.App. 377, 586 A.2d 810 (1991); *Mejia v. State*, 90 Md.App. 31, 599 A.2d 1207 (1992), *cert. granted, Mejia v. State*, 326 Md. 435, 605 A.2d 137 (1992).

Even two pre-*Batson* decisions, *Lawrence v. State*, 295 Md. 557, 457 A.2d 1127 (1983) and *Evans v. State*, 304 Md. 487, 499 A.2d 1261 (1985), that flirted with forsaking *Swain v. Alabama* relied upon, even for that flirtation, the "fair cross-section" notion of the Sixth Amendment that had, since *Swain v. Alabama,* been incorporated into the Fourteenth Amendment by *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

To find the unique and parochial Maryland view of the peremptory challenge, one begins with *Turpin v. State*, 55 Md. 462 (1881), which traced the history of the challenge in this commonwealth. By the acts of 1737, ch. 2, the colonial Legislature extended to defendants the right to make peremptory challenges in capital cases. By the Act of 1841, ch. 162, the right was broadened to include all crimes. It was only by the Act of 1872, ch. 40, that peremptory

challenges were first made available to the prosecutor. In *Biddle v. State,* 67 Md. 304, 10 A. 794 (1887); *Rogers v. State,* 89 Md. 424, 43 A. 922 (1899); *Whittemore v. State,* 151 Md. 309, 134 A. 322 (1926); and *Parker v. State,* 227 Md. 468, 177 A.2d 426 (1962), the Court of Appeals dealt with various procedural incidents of the use of peremptories in this State. We ourselves discussed peremptory challenges in Maryland in *Bever v. State,* 4 Md.App. 436, 243 A.2d 634 (1968) and *Johnson v. State,* 9 Md.App. 143, 148–151, 262 A.2d 792 (1970). The Maryland view of the appropriately and truly peremptory nature of the peremptory challenge was well expressed by Judge Barnes for the Court of Appeals in *Brice v. State,* 264 Md. 352, 366, 286 A.2d 132 (1972):

> "In short, the right to exercise the peremptory strike is unfettered and may be exercised by either party for any reason or indeed for no reason. Hunch, passing impression, appearance of the prospective juror, or any other consideration may lead to the exercise of the peremptory challenge and no inquiry may be made in regard to why it is exercised."

Even post-*Batson,* the more exalted view of the peremptory challenge continues to be the Maryland view. As Judge Orth so well expressed it in *State v. Gorman,* 315 Md. 402, 405–406, 554 A.2d 1203, 1204 (1989):

> "In providing for jury trial in criminal causes, Maryland, in general, adheres to the common law system of trial by an impartial jury of 12 persons who must unanimously agree on a verdict. . . .
>
> In the empaneling of a petit jury the system provides, not only for challenges for cause, but for peremptory challenges. 'The peremptory challenge has been in use without scrutiny into its basis for nearly as long as juries have existed.' It was a venerable fixture at the common law and crossed the sea to become one of the most important of the rights in our federal and state systems. Although the federal and Maryland Constitutions do not confer a right to peremptory challenges, 'those challenges

traditionally have been viewed as one means of assuring the selection of a qualified and unbiased jury.' ...

Throughout its long history, the description of the challenge as 'peremptory' meant precisely what that adjective connoted in common usage—'conclusive or absolute; decisive.' " (citations omitted) (footnotes omitted).

In holding against the appellants on this point, it is not so much a case of finding that these facts do not constitute a violation of Maryland law. It is rather the case that we find no *Maryland* law that these facts could violate.

### *Batson v. Kentucky: Racially Based Peremptories*

■ The appellant Tyler alone charges that the State violated the constitutional command of *Batson v. Kentucky* by using racially motivated peremptories. The prosecutor explained, peremptory by peremptory, that his challenges were not motivated by racial considerations but by other non-racial considerations. The trial judge, "who enjoy[ed] the immeasurably superior vantage point to sense the mood and to catch the tone of the entire proceeding," *Bailey v. State*, 84 Md.App. 323, 328, 579 A.2d 774 (1990), believed the prosecutor was telling the truth and accepted his explanations. That is really all there is to it.

Fourteen of the prosecutor's twenty challenges were used to excuse black prospective jurors. Eleven of those fourteen challenges were directed at black females. The explanations for those eleven challenges were:

1. **Juror # 20**—"Both [she] and her husband work at the Post Office. I find this is a job, frankly, that sometimes they're not the most motivated government employees. As a general theory of the State's case, the State wanted more men on this case, and wanted older as opposed to younger, and this was a female. It was the first person I struck, and I struck her because of her occupation, not her sex."

2. **Juror # 26**—"Her husband was a lawyer. I like to keep people who have a legalistic background, or a spouse [who has], off the jury."

3. **Juror # 31**—"This woman was the one who came to the bench and indicated that her cousin had been shot by the police, indicated that there hadn't been a trial for either one, suggesting the police might have done something wrong. In addition to that, she is a professor at the University, and appeared to be a liberal, as opposed to a conservative, thinker, and I struck her for all those reasons."

4. **Juror # 60**—"I struck this woman because of her age [28 years old]."

5. **Juror # 92**—"This woman was unemployed. Her brother had been convicted of armed robbery, and she was a woman, and for all those reasons, I struck her."

6. **Juror # 99**—"[A]t the time, its the State's memory that the jury in the box was approximately nine women and three men, and the State ... was trying to get older people in the jury, and more men, and this was a young black female. Race had nothing to do with it, but she was young and female, and that was the reason I struck her."

7. **Juror # 110**—"[The juror] was a black woman, and she was struck (a) because of her sex, and (b) she had served on a jury last week in front of Judge Femia, and had compromised a very strong case. I had been aware of that through my office and for those two reasons, I struck her."

8. **Juror # 127**—"This was a young female, and was struck for that reason."

9. **Juror # 128**—"Another woman, and at this stage ... although we were coming very close to running out of jurors, the State was trying to get down to Juror # 130, who is a black male, Traverne Barts, and it was basically a decision that I made that either we're going to end up with exactly 12 or they're going to exercise their strikes, and I struck Miss Petty, who was Number 128, and Miss

Watts, which is 129, in order to get to the male, who was Mr. Barts, a black male."

10. **Juror # 129**—[Same reason as above in the case of Juror # 128].

11. **Juror # 19** (from a different panel)—"I struck her and the juror before her, Miss Levine, who is a white female, in order to get to Juror # 20, who was a white male, Mr. Parsly, and at that time I knew that everyone else was out of strikes and if I exercised my last two strikes in that fashion, I could get Mr. Parsly on the jury."

A variety of non-racial reasons were given for those eleven strikes. The most frequently recurring reason was that the challenged jurors were female. For immediate purposes of considering the particular contention now before us, a challenge based upon gender (whatever its propriety) is not a challenge based upon race.

Three additional peremptories were exercised by the State against black males. The State gave Judge Johnson its reasons for having exercised them:

1. **Juror # 33**—"[I]t was because of his age, 26, and [his] job in and of itself didn't show any particular career orientation."

2. **Juror # 119**—"This is an individual who came to the bench, and I wrote down on my sheet when I was striking him that I did not like the look he gave me, and occasionally he gave bad body language, and therefore I did strike him."

3. **Juror # 122**—"[The juror] was sloppily dressed, and gave the general appearance of not taking the Court seriously because of his appearance, his hair, and for those reasons, I struck him.

After hearing argument from counsel, Judge Johnson ruled:

"I think Mr. Foley has given cogent reasons for his use of the strikes, and I find that he has not unconstitutionally or impermissibly used his peremptory [challenges] based

on race; and I think he has very good reasons, tactical and strategic, for doing what he did, and that those reasons were not based on race."

In urging us to substitute our judgment for that of Judge Johnson on the believability of the State's explanations, Tyler relies upon *Chew v. State*, 317 Md. 233, 244–245, 562 A.2d 1270 (1989), which did speak of appellate review in terms of "an independent constitutional appraisal concerning the existence of neutral, non-racial reasons for the striking of a juror." That reliance, however, is totally misplaced.

More recently, the Supreme Court has, in *Hernandez v. New York*, 500 U.S. ——, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), treated definitively the proper standard of appellate review of a trial judge's *Batson* decisions. There cannot be, by its very nature, an independent constitutional review at the appellate level because the exclusive thing that is being reviewed is the credibility of the prosecutor when he gives his reasons for challenging. If he is believed, that ends the analysis. We do not assess whether his reasons are good or bad, wise or foolish, logical or illogical, generous or mean-spirited. We only assess whether he is telling the truth when he claims that his reasons are based upon something other than race. In all other regards, his reasons, laudatory or appalling, are none of our business.

In *Hernandez*, the Supreme Court expressly rejected independent, *de novo* review in favor of the more deferential "clearly erroneous" standard. It explained that this has to be the standard when the issue is one of credibility:

"The trial judge in this case chose to believe the prosecutor's race-neutral explanation for striking the two jurors in question, rejecting the petitioner's assertion that the reasons were pretextual. In *Batson*, we explained that *the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact* of the sort accorded great deference on appeal. . . .

*Batson*'s treatment of *intent to discriminate as a pure issue of fact,* subject to review under a deferential standard, *accords with our treatment of that issue in other equal protection cases."* (citations omitted) (emphasis supplied).

—— U.S. at ——, 111 S.Ct. at 1868–1869, 114 L.Ed.2d at 408–409.

The Supreme Court stressed, at —— U.S. ——, at 111 S.Ct. 1866, at 114 L.Ed.2d 406, that a prosecutor's reasons do not have to be good reasons or persuasive reasons in order to be race-neutral reasons:

"A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of our inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed to be race neutral."

The *Hernandez* decision explained fully that an evaluation of the prosecutor's credibility will turn largely on such things as the trial judge's ability to observe the prosecutor's "demeanor" as he exercises his challenges:

"Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson, the finding will 'largely turn on evaluation of credibility.'* ... In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and *the best evidence often will be the demeanor of the attorney who exercises the challenge.* As with the state of mind of a juror, *evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'"* (citation omitted) (emphasis supplied).

—— U.S. at ——, 111 S.Ct. at 1869, 114 L.Ed.2d at 409. The Supreme Court explained how there cannot be independent appellate review of a trial judge's decision that hinges upon the trial judge's assessment of credibility:

"Petitioner advocates 'independent' appellate review of a trial court's rejection of a *Batson* claim. *We have difficulty understanding the nature of the review petitioner would have us conduct.* Petitioner explains that '[i]ndependent review requires the appellate court to accept the findings of historical fact and credibility of the lower court unless they are clearly erroneous. Then, based on these facts, the appellate court independently determines whether there has been discrimination.' ... But *if an appellate court accepts a trial court's finding that a prosecutor's race-neutral explanation for his peremptory challenges should be believed, we fail to see how the appellate court nevertheless could find discrimination. The credibility of the prosecutor's explanation goes to the heart of the equal protection analysis, and once that has been settled, there seems nothing left to review.*" (citation omitted) (emphasis supplied).

—— U.S. at ——, 111 S.Ct. at 1870, 114 L.Ed.2d at 410.

Indeed, our own analysis in *Bailey v. State,* 84 Md.App. 323, 328–329, 579 A.2d 774 (1990), of the appropriate standard of appellate review anticipated *Hernandez v. New York* and is in complete harmony with it:

"It is the trial judge who is in close touch with the racial mood, be it harmonious or be it tense, of the local community, either as a general proposition or with respect to a given trial of high local interest. The trial judge is positioned to observe the racial composition of the venire panel as a whole, a vital fact frequently not committed to the record and, therefore, unknowable to the reviewing court. The trial judge is able to get the 'feel' of the opposing advocates—to watch their demeanor, to hear their intonations, and to spot their frequently unspoken purposes. It is a total process in which nonverbal communication may often be far more revealing than

the formal words on the type-written page. The standard of review, therefore, is perforce that of whether the trial judge's fact finding ... is clearly erroneous."

Judge Johnson's finding that the prosecutor truthfully set out racially neutral explanations for his peremptory challenges was not clearly erroneous.

### Apparently Inconsistent Verdicts

The appellant Eiland alone complains that his sentence for murder was unlawful because the jury, inconsistently, found him guilty of both murder and of being an accessory after the fact to that same murder. Under the law of Maryland prevailing at the time of his trial, it was true that one could not, consistently, be convicted of both murder and with being an accessory after the fact. *Osborne v. State,* 304 Md. 323, 327 n. 3, 499 A.2d 170 (1985). We note in passing that the recently decided case of *State v. Hawkins,* 326 Md. 270, 604 A.2d 489 (1992) changed the Maryland common law in this regard so that, if the evidence is legally sufficient to support both convictions, there will be in the future nothing inconsistent about convicting a defendant for both offenses.

In Eiland's case, for instance, there would be nothing *logically* inconsistent in convicting him of both offenses. In aiding and abetting Tyler in the course of the murder, he was a principal in the second degree as to the murder. In subsequently driving Tyler away from the scene, he, quite independently, was an accessory after the fact to Tyler's murder. *State v. Hawkins,* does, indeed, prohibit multiple punishments for the two closely related crimes. It simply eliminates the notion that the two convictions are necessarily doctrinally inconsistent.

Under the law prevailing at the time of Eiland's trial, however, the convictions were inconsistent and both, therefore, could not stand. They both, of course, did not stand. Recognizing the inconsistency, Judge Johnson vacated the conviction for accessoryship after the fact. Accordingly, he

did not sentence Eiland for that offense and there were, therefore, no multiple punishments imposed upon Eiland.

Eiland relies upon our earlier decision of *Hawkins v. State*, 87 Md.App. 195, 589 A.2d 524 (1991), which had held that a trial judge could not break the deadlock created by inconsistent verdicts and that a new trial was, therefore, mandated. At the very least, he maintains that he was entitled to a remand for resentencing, with the "cap" on that sentencing being the maximum penalty that could be imposed for accessoryship after the fact. *State v. Hawkins*, however, reversed our decision in that regard and held that "the gnarl may be untangled short of the ultimate action resorted to by" us.

The Court of Appeals reasoned that the fault lay in not instructing the jury that if it found a guilty verdict as to murder, it should not go on to consider the accessory charge. The erroneous instruction in failing so to advise, however, would only have impact after the murder verdict had already properly been reached, uncontaminated by the erroneous omission from the instruction. "[T]he prejudice devolved only on the verdict of guilty of the crime of accessory after the fact. The prejudice did not reach the murder verdict; that verdict was proper in all respects and remained unsullied." We hold as did the Court of Appeals in *State v. Hawkins:*

"Inasmuch as the defective instruction despoiled only the accessory after the fact verdict and left the murder verdict chaste and pure, there is no good cause to wash out the judgement entered on the murder conviction."

All the Court of Appeals did in *State v. Hawkins* was to vacate the inconsistent conviction for accessoryship. Here, Judge Johnson has already done that and nothing remains for us but to affirm his action in that regard.

### The Motion to Strike Appendices

With respect to each appellant, the State has filed a Motion to Strike all those parts of the Appendix to the

Appellant's Brief not expressly authorized by Maryland Rule 8–504(b). Although the motions are to some extent mooted by the assessment of all costs against the appellants in any event, the problem of the swollen appendix is becoming sufficiently epidemic to warrant official comment.

Rule 8–504(b) provides, in pertinent part:

"In criminal cases in the Court of Special Appeals, the appellant shall reproduce, as an appendix to the brief, the pertinent part of any jury instructions or opinion of the lower court that deals with points raised by the appellant on appeal."

Thus, the appellant shall reproduce, provided it deals with points raised on appeal:

1. The pertinent part of any jury instruction; and/or
2. The pertinent part of any opinion of the lower court.

Eiland's appendix, by contrast, contains 1) transcript excerpts of the State's closing argument, 2) defense counsel's argument on the Motion for New Trial, and 3) the transcript of the hearing on the defense's challenge to the State's use of peremptories. Tyler's appendix contains copies of various pleadings filed in the court below.

The State's position is that Rule 8–504(b) limits the possible contents of an Appellant's Appendix to the two items expressly authorized. Nothing else is permitted. The appellants, on the other hand, view the two items expressly mentioned in the rule as the mandatory minimum. Those two items, according to the appellants, *must* be included. Other things, moreover, *may* be included, with the rule expressing no prohibition in that regard.

We reject the appellants' reading of the rule. Rule 8–504(b) must be read in conjunction with Rule 8–501(b)(3). That rule provides, in pertinent part:

"A record extract shall *not* be filed ... in a criminal case in the Court of Special Appeals, unless otherwise ordered by the Court." (emphasis supplied).

The Record Extract and the Appendix to the Brief both perform, in longer and shorter ways, essentially the same

function. Rule 8–504(b) is a limited exemption from the otherwise foreclosing language of Rule 8–501(b)(3). The two items expressly spelled out in Rule 8–504(b), which ordinarily might appear in a Record Extract before the Court of Appeals or in a Record Extract in the appeal of a civil case to this Court, may, when pertinent, appear in an Appellant's Appendix. Nothing else is authorized.

Accordingly, we grant the State's Motions to Strike the Appellants' Appendices where those appendices go beyond the limited authorization of Rule 8–504.

JUDGMENTS AFFIRMED; COSTS TO BE SPLIT EQUALLY BETWEEN APPELLANTS.